414

ILLINOIS CENTRAL GULF RAILROAD COMPANY, Plaintiff-Appellee and Cross-Appellant, *v.* THE DEPARTMENT OF LOCAL GOVERNMENT AFFAIRS *et al.*, Defendants.—(THOMAS C. HYNES, Assessor of Cook County, *et al.*, Defendants-Appellants and Cross-Appellees.)

First District (4th Division)    No. 80-1282

Opinion filed October 22, 1981.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Michael F. Baccash, Jane Clark Casey, Henry A. Hauser, and Ronald P. Stake, Assistant State's Attorneys, of counsel), for appellant Thomas C. Hynes.

Reuben & Proctor, of Chicago (Gary M. Elden, Samuel Fifer, and John A. Krivicich, of counsel), for appellee Illinois Central Gulf Railroad Company.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendants, the Department of Local Government Affairs (DLGA), the Cook County Assessor, and the Cook County Treasurer in his position as County Collector, appeal from an order entered in the circuit court of

Cook County which overruled an administrative finding of the DLGA. The DLGA, in 1979, had found that nine parcels of real estate owned by plaintiff, Illinois Central Gulf Railroad Company (Gulf), were subject to local assessment and taxation for the years 1971 to 1978. On review, under a petition filed pursuant to the Administrative Review Act, the trial court reversed the DLGA and found the property to be exempt from local assessment and taxation for those years. On appeal, defendants have sought reversal of the trial court and reinstatement of the finding of the DLGA.

We affirm the trial court's order with modifications.

## Background

The nine parcels of real estate in question are part of a land mass commonly known as the Chicago River Terminal, which is bound on the south by Randolph Street, on the north by the Chicago River, on the east by Lake Michigan, and on the west by Michigan Avenue. Prior to 1950, all of the Terminal property was owned by the Illinois Central Railroad Company, the Gulf's predecessor in title, and was used by the Central exclusively for railroad purposes.

The Central was formed in 1851 by a charter granted by the State of Illinois. ("An Act to incorporate the Illinois Central Railroad company" (Priv. Laws of Ill. 1851, at 61).) Under its charter, the Central was required to construct and operate a midcontinental railroad in Illinois and was given the power to acquire land necessary to carry out this purpose. The Terminal property was acquired for this purpose by the Central in different acquisitions in the 19th and early 20th centuries.

Under the charter, the Central was required to pay a gross receipts tax to the State and a property tax assessed by the State. The Central was "exempted from all [other] taxation of every kind." (Ill. Rev. Stat. 1979, ch. 120, par. 374.) This general exemption from local assessment and taxation applied only to property acquired by the Central to carry out its charter purpose, which was to construct, maintain, and operate a railroad. It did not apply to property acquired and used for nonrailroad purposes, which property was not exempt from local assessment and taxation. *In re Swigert* (1886), 119 Ill. 83, 6 N.E. 469.

All parties before us concede that all the Terminal property was exempt from local assessment and taxation until the 1950's under the Central's charter. Beginning in the 1950's, because of the growth of interstate highways and the shipment of freight by truck, the Central's need for the lake front terminal began to decline. As a result, the Central began to sell and convey different parcels in the Terminal area to private developers (the Prudential Building and the Outer Drive East are examples of such sales and conveyances). As soon as title to a parcel was

conveyed, it became subject to local assessment and taxation. This series of piecemeal sales continued until 1969 when the Central entered into two separate contracts to sell all of its remaining property in the Terminal area to two entities, a limited partnership known as Metropolitan Structures and a joint venture known as the Illinois Center Plaza Venture.

The two contracts were executory in nature. Title to individual parcels was to be conveyed, and payments for those parcels were to be made, at different times over a period of 20 years, with all remaining property to be conveyed in 1990. The nine parcels in question in this case were subjects of the contracts. It appears that by 1979, title to these nine parcels had not yet been conveyed. Under the contracts, the Central reserved the right to use all property for railroad purposes until title was conveyed.

The two contracts were subject to approval by the Illinois Commerce Commission. To obtain such approval, the Central had to show that the sale of the property would not interfere with the Central's duty to the public to maintain and operate the railroad. At hearings held before the Commission in late 1969, a representative of the Central told the Commission that the Terminal property was no longer necessary or useful to the Central in carrying out its operations and its duty to the public. He said that, though operations continued in the area, the Central could gradually relocate all of its operations in the area to its property south of Randolph Street without any noticeable impact on the public. The Commission approved the sale and the contracts became binding in late 1969.

Following the approval of the contracts, the Central continued to use property in the Terminal area for railroad purposes. However, the Cook County Assessor discovered that on January 1, 1971, nine random and unconnected parcels in the Terminal were vacant. The assessor determined that these nine parcels should be subject to local assessment and taxation because they were not being used for railroad purposes and because they were subjects of the contracts for sale. Proceedings were begun before the DLGA to determine whether the nine parcels were still exempt as charter line property of the Central. These proceedings lasted until 1979. At one point, in 1972, the DLGA issued an order holding the property to be nonexempt, but this order was later remanded by the trial court for the DLGA to take further evidence. Amendments were made in the proceedings over the years to include the years 1972 to 1978 as years in which the property should be subject to local assessment and taxation.

The original issue before the DLGA was whether the nine parcels were exempt as charter line property of the Central. This issue became somewhat complicated on August 10, 1972. On that date, the Central transferred all of its assets to the Gulf as part of a reorganization plan

approved by the Interstate Commerce Commission. Because of this transfer, the supreme court subsequently held that the Gulf, after December 31, 1972, had no right to the use of the Central's tax exemption under the charter. (*Snow v. Dixon* (1977), 66 Ill. 2d 443, 362 N.E.2d 1052.) As a result, the legal issues before the DLGA changed after the transfer. Initially, the DLGA had to determine if the property was exempt as charter line property of the Central in the years 1971 and 1972. Then, the DLGA had to determine whether the property was exempt for the years 1973 to 1978 when it was owned by the Gulf.

The applicable exemption statute for the Gulf is found in the Revenue Act, section 79 *et seq.* (Ill. Rev. Stat. 1979, ch. 120, par. 560 *et seq.*). Under the Revenue Act, a railroad's "operating property" is exempt from local assessment and from taxation based on such an assessment. "Operating property" is defined as:

> "[A]ll tracks and right of way, all structures and improvements on such right of way, all rights and franchises, all rolling stock and car equipment, and all other property, real or personal, tangible or intangible connected with or used in the operation of the railroad including real estate contiguous to railroad right of way or station grounds held for reasonable expansion or future development."

(Ill. Rev. Stat. 1979, ch. 120, par. 560(2).) Any real estate owned by a railroad which does not meet the definition of "operating property" is defined as "non-carrier real estate" and is subject to local assessment and taxation. Ill. Rev. Stat. 1979, ch. 120, par. 560(4).

Thus, the DLGA had to determine whether the property was exempt in 1971 and 1972 as charter line property and whether it was exempt in 1973 through 1978 under the Revenue Act as "operating property."

The evidence presented before the DLGA was voluminous. Much of it was in the form of affidavits, charts, photographs, and documents. Little of the evidence presented by either side was challenged for its truthfulness and accuracy. As a result, the decision on whether the nine parcels were exempt depended on the application of the law to the following undisputed facts.

First, the nine parcels were included in the contracts for sale, but title to the nine parcels had not been conveyed while the proceedings were in progress. In the contracts, the Central had reserved the right, for itself and its assigns (the Gulf), to use the property for railroad purposes until title was conveyed.

Second, the Central had admitted in the proceedings before the Illinois Commerce Commission that the property was no longer necessary and useful to the railroad to carry out its public duty. However, the Central had also said that it would continue to use property in the

Terminal area and all of its operations in the area could gradually be relocated to the area south of Randolph Street without any detriment to the public.

Third, the nine parcels were vacant on January 1, 1971. However, other parcels had tracks on them which were being used by the railroad. Also, though the parcels were vacant on January 1, 1971, over the years following 1971, at least three of the parcels had tracks placed on them at different times and those parcels were used for railroad purposes on occasion.

Fourth, during the years 1971 to 1978, both the Central and the Gulf actively and continuously solicited railroad business for the Terminal area including the nine parcels. Most of the attempts to entice third parties to contract for railroad services failed, but some were successful as to other areas in the Terminal.

Fifth, the Terminal area was designated in yearly tariffs filed with the Interstate Commerce Commission during the years 1971 through 1978 as being available for "team track" use. This meant that the railroad was willing to provide railroad services, in particular the transfer of freight from railroad cars to trucks, from the tracks in the area to anyone who applied with a legitimate offer. The area had been designated for "team track" use since the 1950's.

Sixth, the nine parcels were exempt as charter line property for all the years preceding 1971. Also, though some of the parcels were vacant for the entire period from 1971 to 1978, since they were contiguous to or near other parcels which had tracks on them, temporary tracks could have easily been laid on the parcels and used by the two railroads if the railroads could have acquired business for the area. Neither the Central nor the Gulf ever attempted to use the nine parcels for other than railroad purposes.

Based on the above facts, the DLGA found that the nine parcels had lost their charter line exemption on January 1, 1971, and were thus subject to local assessment and taxation for the years 1971 and 1972. The DLGA found that the nine parcels were not "operating property" under the Revenue Act for the years 1973 through 1978, but were "non-carrier real estate" subject to local assessment and taxation. On review under the Administrative Review Act, the trial court reversed the DLGA and held the property to be exempt for the years 1971 through 1978.

OPINION

I

*Charter Line Exemptions*

The facts as we have set them out are essentially undisputed. The issues presented to this court are primarily legal ones, which are: (a) based

on the undisputed facts, were the nine parcels exempt as charter line property of the Illinois Central during the years 1971 and 1972 and (b) based on the undisputed facts, were the nine parcels exempt as "operating property" of the Gulf during the years 1973 through 1978? (See *In re Swigert* (1886), 119 Ill. 83, 6 N.E. 469; *cf. Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 194 N.E.2d 257.) We first address the charter line exemption issue.

Under the general exemption of the Central's charter, the railroad's property was exempt from all taxation except taxes imposed by the State. (Ill. Rev. Stat. 1979, ch. 120, par. 374.) However, this exemption applied only to property acquired by the Central for the purpose of carrying out its charter. Thus, when the Central acquired property pursuant to its power under the charter, the property, to be originally exempt, had to be acquired for a purpose having a necessary connection to the construction, operation, maintenance, or development of its railroad. (*In re Swigert* (1886), 119 Ill. 83, 6 N.E. 469.) If the Central acquired property and used or intended to use it for any other purpose, the property was not deemed to be originally exempt from local assessment and taxation. (*In re Swigert* (1886), 119 Ill. 83, 6 N.E. 469; *Illinois Central R.R. Co. v. Irvin* (1874), 72 Ill. 452.) Finally, if the Central acquired property and used it for railroad purposes, thus making it originally exempt, and thereafter abandoned the property for possible use in connection with the railroad, the property would lose its exemption from local assessment and taxation. *People ex rel. Lee v. Illinois Central R.R. Co.* (1907), 231 Ill. 151, 83 N.E. 132.

The issue here is whether the nine parcels, which were originally exempt, lost their exemption by 1971. This depends on whether the facts show that the Central abandoned the property for possible use in connection with the railroad. (*People ex rel. Lee v. Illinois Central R.R. Co.* (1907), 231 Ill. 151, 83 N.E. 132.) In *People ex rel. Lee*, the supreme court failed to find such an abandonment based on facts less favorable to the Central than those in the present case. In that case, the railroad owned a quarry which it used to provide ballast for its tracks. There was no question that the property, when acquired, was exempt under the charter from local assessment and taxation. After several years of use, the Central ceased to operate the quarry with its own employees but entered into a contract with a third party which allowed the third party to locate a crushing plant on the property. The third party, under the contract, was required to provide the Central with stone for its tracks, but the third party could also sell stone to anyone else upon written consent of the Central.

After a few years of operation, the third party ceased operations in the quarry, and the railroad subsequently sold licenses to other third

parties to remove ice from the quarry for their own benefit. The railroad stopped using the quarry for its own benefit entirely.

Based on these facts, the supreme court found that the property still retained its exempt status because the railroad had not abandoned the quarry for use in connection with the railroad. Though there was no evidence of any attempts by the Central to use the quarry for railroad purposes after the railroad ceased taking stone for use as ballast, the court said that the possibility of future use existed and thus abandonment had not been shown.

In the present case, though the nine parcels were subject to the contracts of sale, the Central reserved the right to use the property for railroad purposes and the possibility of future use for railroad purposes existed. In fact, the railroad made many attempts to procure railroad business for the area. Also, though all of the parcels were vacant on January 1, 1971, in the years thereafter tracks were actually placed on some of the parcels for railroad use. Additionally, the Terminal area, including the nine parcels, was available for "team track" use, and thus the railroad was ready and willing to use the area for railroad purposes upon demand. Finally, the railroad never attempted to use the property for any purpose other than railroad purposes.

■■ Based on the foregoing, we cannot find that the Central abandoned the nine parcels for use in connection with the railroad, and we hold the nine parcels were exempt in 1971 and 1972 as charter line property of the Central.

## II

*Revenue Act Exemption*

We turn now to the issue of whether the nine parcels were "operating property" of the Gulf during the years 1973 through 1978. The term "operating property" includes real estate connected with the operation of a railroad and real estate held for reasonable expansion or future development of the railroad. Ill. Rev. Stat. 1979, ch. 120, par. 560(2).

Defendants argue that the parcels were not being held by the Gulf for reasonable expansion or future development of the railroad. Defendants assert that, since the parcels were included in the contracts for sale, since the Central admitted at public hearings before the Illinois Commerce Commission that the Terminal property was no longer necessary or useful to the operations of the railroad, and since the parcels were vacant in 1971 and many remained vacant thereafter, the parcels could not be deemed to be held for reasonable expansion or future use.

Though all of the facts pointed out by defendants tend to support their conclusion, defendants' argument ignores all the other facts in the case. The nine parcels were subject to the contracts for sale, but title to the

nine parcels was not conveyed by the time the case was concluded at trial. The railroad had reserved the right to use any property in the Terminal area until title was conveyed, thus indicating an intent to continue to use the property when needed.

Though the railroad said in the proceedings before the Commerce Commission that the Terminal property was no longer necessary or useful in the performance of its operations or duty to the public, the railroad also said that operations would continue in the area and that it intended to gradually relocate its operations in the Terminal area to its property located south of Randolph Street, thus indicating that the property would still be useful until title was conveyed in accordance with the contract.

Though all nine parcels were vacant at one time, and most of them remained vacant, some of the parcels were actually used for railroad purposes during the time between 1971 and 1978. Also, the railroad made continuous attempts to solicit business for the area and left the area available for "team track" use, thus indicating that the railroad was ready and willing to use the property for railroad purposes if it could find anyone willing to contract for business and that it had no intent of using the property for other than railroad purposes. Additionally, the railroad could easily place tracks on the parcels and connect them to other existing tracks if it could find someone to contract for its services.

■■ Hence, though the Gulf intends to transfer title to the parcels in the future and many of the parcels remain vacant, all of its actions indicate that the Gulf would use the property in the future if it could find anyone willing to contract for its services. Thus, based on all the facts, we believe that the property can be deemed to be held for future development of railroad operations and is thus "operating property" under the Revenue Act (Ill. Rev. Stat. 1979, ch. 120, par. 560(2)) and was exempt from local assessment and taxation for the years 1973 through 1978.

Accordingly, for the reasons noted, we affirm the decision of the trial court which held the nine parcels to be exempt from local assessment and taxation for the years 1971 through 1978. However, we note that in the trial court's final order it held the property to be exempt as charter line property from January 1, 1971, until August 10, 1972, and exempt under the Revenue Act for all periods following August 10, 1972. The parties agree that the proper date for the expiration of the charter line exemption should be December 31, 1972, and not August 10, 1972. Accordingly, we modify the trial court's order to hold the property was exempt as charter line property until December 31, 1972, and exempt under the Revenue Act for the years 1973 through 1978.

Affirmed as modified.

ROMITI, P. J., and JOHNSON, J., concur.