(No. 55942.—

ILLINOIS CENTRAL GULF RAILROAD COMPANY, Appellee, v. DEPARTMENT OF LOCAL GOVERNMENT AFFAIRS *et al.* (Thomas C. Hynes, County Assessor, *et al.*, Appellants).

*Opinion filed January 24, 1983.—Rehearing denied April 8, 1983.*

112

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey, Deputy State's Attorney, and Susan Condon, Assistant State's Attorney, of counsel), for appellants.

Reuben & Proctor, of Chicago (Gary M. Elden, Samuel Fifer, and John A. Krivicich, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

The question presented here is whether Cook County may assess and tax nine parcels of land owned by the plaintiff, the Illinois Central Gulf Railroad Company (ICG). The nine parcels, located in the downtown section of the city of Chicago, are in the general area bounded by the Chicago River, Lake Michigan, Randolph Street,

and Michigan Avenue. In the 19th and early 20th centuries the Illinois Central Railroad Company (the ICG's predecessor in title) acquired the land in this area to provide a terminal on the Chicago River for its railroad operations.

The county defendants (the assessor of Cook County and the Cook County collector) concede that for many decades after acquisition by the railroad, all of the land in the terminal area was exempt from local property taxation under section 22 of the Illinois Central's charter (Ill. Rev. Stat. 1971, ch. 120, par. 374). In the 1950's, however, the Illinois Central's need for the terminal property for railroad purposes was sharply reduced. This encouraged the railroad to sell peripheral parcels in the terminal area to private developers. Changes in the terminal area began with the sale of property for the construction of the Prudential Building in the early 1950's and proceeded through the next two decades with the Outer Drive East Building (mid-1950's), One Illinois Center (mid-1960's), the Standard Oil Building (late-1960's), Chicago Hyatt Hotel (early 1970's), and Harbor Point Building (early 1970's). In each of these cases the parcels of land used for the developments lost their exemptions and went on the tax rolls upon the sale and conveyance of the parcels from the railroad to the private developers.

By the late 1960's, the continuous contraction in the use of the terminal property for railroad purposes made it feasible for the railroad to sponsor a comprehensive development plan for the central core of the terminal area. Consistent with this plan, the railroad in 1969 sold the remaining 83 acres of undeveloped land in the terminal area to two private developers. At the time of the sale, tracks and other railroad facilities were located on some of the 83 acres. The nine parcels of land involved in this case, however, were vacant as of January 1, 1971.

Under the sales contracts the railroad agreed to convey the parcels of land to the purchasers at indeterminate intervals over a 20-year period. Both contracts reserved use of each parcel for railroad purposes until it was finally conveyed. The contracts contain general limitations on when conveyances may occur. The purchasers can insist on conveyance at any time, but they must accept specific percentages of the parcels over stated intervals. The percentage requirements, however, are broadly linked to and limited by progress in the construction of the streets, utilities and public improvements that were necessary to make the terminal area suitable for private development. The railroad and the city of Chicago separately agreed to undertake and finance these public improvements, although under the sales contracts the purchasers would reimburse the railroad by paying a portion of the construction costs upon the conveyance of each parcel.

In 1971 the Cook County assessor initiated administrative proceedings before the Department of Local Government Affairs (Department) to determine whether the land subject to the executory sales contracts had lost its exemption from local taxation for the tax year 1971. The railroad maintained throughout these proceedings that the property was exempt from local taxation under the exemptions contained in section 22 of the Illinois Central charter. (Ill. Rev. Stat. 1971, ch. 120, par. 374). In addition, the railroad maintained that the property was "operating property" held for railroad purposes as defined in section 79(2) of the Revenue Act of 1939 (Ill. Rev. Stat. 1971, ch. 120, par. 560(2)) and that consequently it was assessable only by the Department and not by local authorities. The railroad also claims that the proceedings before the Department were unconstitutional and void because the act creating that department violated the prohibition against amendments by reference in the 1870

Illinois Constitution. Ill. Const. 1870, art. IV, sec. 13.

After lengthy proceedings, the Department held that for tax year 1971 none of the exemptions applied to the nine parcels which are the subject of this action, and that they were assessable and taxable by Cook County. The railroad filed an action in the circuit court of Cook County seeking a review of this administrative decision. During these proceedings, the railroad's pleadings were amended to include the tax years 1972 to 1978. The circuit court reversed the Department's holding with respect to 1971, declaring the property was not taxable or assessable in that year, and also holding that it was not taxable or assessable for the years 1972 through 1978.

On appeal by the Department and the county defendants, the appellate court affirmed the decision of the circuit court with minor modifications. (101 Ill. App. 3d 414.) The appellate court held that the nine parcels of land in the terminal area were exempt from local property taxation for tax years 1971 and 1972 under section 22 of the Illinois Central charter (Ill. Rev. Stat. 1971, ch. 120, par, 374). The appellate court also held that for tax years 1973 to 1978 the parcels were "operating property" and for that reason they were not assessable by local authorities. Ill. Rev. Stat. 1971, ch. 120, pars. 498, 560(2), 561, 562.

Our conclusion is that the Department's administrative decision was correct, that the nine parcels in the terminal area are subject to assessment and taxation by Cook County for the tax years 1971 through 1978, and that the act creating the Department of Local Government Affairs was constitutional.

I

THE PARCELS ARE NOT EXEMPT UNDER SECTION 22 OF THE ILLINOIS CENTRAL CHARTER FOR TAX YEARS 1971 AND 1972.

Section 22 of the Illinois Central charter provides in

relevant part:

> *"The lands selected under the act of congress* entitled 'An Act granting the right of way, and making a grant of land to the states of Illinois, Mississippi and Alabama, in aid of the construction of a railroad from Chicago to Mobile', *passed September 20, 1850, and authorized by this Act to be conveyed shall be exempt from all taxation under the laws of this state, until sold and conveyed* by the Illinois Central Railroad Company or the trustees designated in this Act. The stock, property and assets belonging to the company shall be listed by the president, secretary or other officer, with the Department of Revenue and an annual tax for state purposes shall be assessed, upon all the property and assets of every name, kind and description belonging to that company. Whenever the taxes levied for state purposes shall exceed $3/4$ of 1% per year, such excess shall be deducted from the gross proceeds or income required to be paid by the company to the state, *and the company is hereby exempted from all taxation of every kind, except as herein provided for."* (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 120, par. 374.)

Section 22 thus contains two distinct exemptions from taxation: a "lands exemption" which is contained in the first sentence quoted above, and a "general exemption" which is contained in the last sentence quoted above.

The ICG may claim the tax exemptions contained in section 22 only for tax years prior to and including 1972. On August 10, 1972, the ICG acquired the assets of the Illinois Central Railroad Company under a reorganization plan. In *Snow v. Dixon* (1977), 66 Ill. 2d 443, 463, *cert. denied* (1977), 434 U.S. 939, 54 L. Ed. 2d 298, 98 S. Ct. 429, this court held that the 1972 reorganization did not transfer the tax exemptions set forth in section 22 to the ICG. The ICG, therefore, may only claim the charter exemptions for tax years prior to the reorganization, in this case 1971 and 1972.

## A. The "General Exemption"

The "general exemption" in section 22 provides that except for a 5% gross receipts tax and a limited State property tax, the railroad "is *** exempted from all taxation of every kind." (Ill. Rev. Stat. 1971, ch. 120, par. 374.) This court has never literally applied the language of the "general exemption"; if it did, the Illinois Central would be immune from any other taxation even when engaged in business activities with only a tenuous relationship to its railroad activities. Such an expansive interpretation of the "general exemption" would violate the principle that "[s]tatutes exempting property from taxation must be strictly construed and cannot be extended by judicial interpretation." *Rotary International v. Paschen* (1958), 14 Ill. 2d 480, 486; see also *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 155; *Kiwanis International v. Lorenz* (1961), 23 Ill. 2d 141, 145.

To limit the expansive language of the "general exemption" this court has always interpreted it in light of the legislature's purpose in chartering the Illinois Central Railroad Company:

"The object of creating [the Illinois Central Railroad Company] was, to construct and operate a great railroad through the central part of the State. *** Every section of the act relates to the accomplishment of this purpose and none other. It was to aid in it that the munificent donation of lands was made by the State, and the exemption granted by the 22d section.
***

The taxes, then, from the payment of which the legislature intended to relieve [the Illinois Central], could have been only the taxes which it, as a railroad corporation, would be otherwise liable to pay upon its property acquired in the prosecution of its business in constructing and operating these lines of road. None other could have been contemplated, for the plain reason that it was not intended that any other business should be engaged in." (*Illinois Central R.R. Co. v. Irvin* (1874), 72 Ill. 452, 454-55.)

To ensure that only the railroad operations of the Illinois Central would benefit from the exemption, this court held in *Irvin* that only property "which was necessary and indispensable to the construction and use of the road was within the exemption." 72 Ill. 452, 456.

Two cases illustrate the application of the "necessary and indispensable" standard. In *Irvin,* the railroad was operating a steamboat that it argued promoted its railroad business by ferrying passengers and freight from the southern terminus of the Illinois Central at Cairo, Illinois, to the northern terminus of the Mobile & Ohio Railroad at Columbus, Kentucky. The court held that this peripheral promotion of the company's railroad business was not sufficient to bring the steamboat within the "general exemption."

*In re Swigert* (1886), 119 Ill. 83, dealt with a grain elevator that the railroad had erected alongside its right-of-way and leased to a private party. Although the elevator did tend to promote the railroad's haulage of grain, this court held that the elevator was not covered by the "general exemption," both because it was not "necessary" to obtain the grain business for the railroad and because it was also used for nonrailroad purposes. 119 Ill. 83, 90-91; see also *Illinois Central R.R. Co. v. People ex rel. Hodges* (1886), 119 Ill. 137.

The railroad contends that the "necessary and indispensable" standard does not apply to the circumstances of the sale of its property in the Chicago terminal area. It points out that *Irvin* and *Swigert* both involved the question of whether certain property had *acquired* exempt status conferred by the charter, while the present case involves a different question—whether property which unquestionably was exempt at one time has now *forfeited* its exemption. In the case of forfeiture, the railroad maintains that the local taxing authorities must establish that the railroad has "permanently abandoned" the property for any railroad

use. Both the circuit court and the appellate court agreed with the railroad's contention and applied a "permanently abandoned" test in establishing the status of the nine parcels in the terminal area under the "general exemption." (See 101 Ill. App. 3d 414, 418-20.) We do not agree that the "permanently abandoned" standard applied by the circuit and appellate courts is the proper one.

The railroad argues that this court has often applied standards similar to the "permanently abandoned" standard in determining whether a railroad has forfeited its right-of-way. (See, *e.g.*, *Abens v. Chicago, Burlington & Quincy R.R. Co.* (1944), 388 Ill. 261, 270; *Golconda Northern Ry. v. Gulf Lines Connecting Railroad* (1914), 265 Ill. 194, 206.) In that context, however, the application of the stringent abandonment standard reflects this court's traditional concern for avoiding accidental and unintended forfeitures of legal interests in land. Thus, this court has often relied upon presumptions and legal standards that require a substantial showing of intent to abandon before such interests are declared forfeit.

In determining whether tax exemptions apply, this court has adopted the opposite approach; in such cases all doubts are resolved against the applicability of the tax exemption. In *Swigert* this court observed:

"It is obvious that all laws exempting property from taxation are not only restrictions or limitations on the taxing power, but they necessarily result in an unequal distribution of the burdens of government. The effect is not only to relieve the property exempted, from the payment of its due proportion of taxes, but that which it ought to pay, and would pay, under an equal and fair apportionment of them, must also be collected from the property not exempted. These considerations have very properly induced courts to adopt what is known as a strict construction, in giving effect to such laws,—hence nothing will be held to come within the exemption which does not clearly appear to be so, and all reasonable intendments

will be indulged in favor of the State." (119 Ill. 83, 86-87.)

Applying a "permanently abandoned" standard for determining whether a taxpayer has lost a tax exemption is inconsistent with the rule which resolves all doubts concerning the applicability of the exemption against the taxpayer.

In arguing that the "permanently abandoned" standard is appropriate, the railroad also relies heavily upon *People ex rel. Lee v. Illinois Central R.R. Co.* (1907), 231 Ill. 151. In *Lee* the railroad had used a stone quarry for many years as a source of ballast for its roadbeds. For the four years immediately prior to the litigation, however, the quarry had been idle. Despite the quarry's idleness the court held that the quarry was "necessary and indispensable" to the maintenance and safe operation of the railroad:

> "It is manifest that this quarry *** was used in connection with the railroad for railroad purposes. Gravel and ballast are indispensable to the maintenance of the road-bed and the safe operation of the road. Whatever was necessary for the construction and operation of the railroad was exempt from taxation. (*In the matter of Swigert*, 119 Ill. 83.) Though for the present it is not worked, the evidence does not show that the quarry has been permanently abandoned as a source from which to take ballast. So far as appears the tracks are still there, and it may be used again at any time. It is not used for any other purpose." 231 Ill. 151, 152.

It was not actually a "permanently abandoned" standard that was applied in *Lee*. Instead, this court expressly applied the "necessary and indispensable" test that it had adopted in *Irvin* and applied in *Swigert*. The "permanently abandoned" language merely crept into the portion of the court's opinion that applies the "necessary and indispensable" standard to the facts in *Lee*, facts which are distinguishable from those of the present case. In *Lee*, the railroad did not use the parcel of land for any substantial purpose other than for a reserve supply of ballast. (*Cf. State Board of Equalization v. People ex rel. County of Al-*

*exander* (1907), 229 Ill. 430, 461 (bridge exempt from taxation under general exemption because unlike grain elevator in *Swigert* "[i]t is used in the business of operating a railroad, and in no other business").) On its facts, the present case is more analogous to *Swigert* than to *Lee*; the railroad here has sponsored a massive real estate development program in the terminal area, and it appears that the property, instead of being held for maintenance or reasonable expansion of the railroad, is held for another purpose, completion of the development program.

At oral argument the attorney for the railroad acknowledged that if the "necessary and indispensable" standard applies in this case rather than the "permanently abandoned" standard, the railroad could not succeed in its claim that the nine parcels are exempt under the "general exemption." In any case, the evidence discussed at length below that we rely upon in deciding that the parcels are not "operating property" under section 79(2) of the Revenue Act of 1939 (Ill. Rev. Stat. 1971, ch. 120, par. 560(2)) also establishes that the property is not "necessary and indispensable" to the operation of the railroad.

### B. The "Lands Exemption"

The "lands exemption" in section 22 provides:

> *"The lands selected under the act of congress* entitled 'An Act granting the right of way, and making a grant of land to the states of Illinois, Mississippi and Alabama, in aid of the construction of a railroad from Chicago to Mobile', passed September 20, 1850, *and authorized by this Act to be conveyed shall be exempt from all taxation under the laws of this state,* until sold and conveyed by the Illinois Central Railroad Company or the trustees designated in this Act." (Emphasis added.) Ill. Rev. Stat. 1971, ch. 120, par. 374.

The parties differ over which type of lands are referred to by the words "[t]he lands selected under the [1850] act of congress." The railroad interprets this language as referring to any land identified in the original survey of the

railroad line authorized in the charter. Under this interpretation the nine parcels of land in the terminal area would be among the lands "selected" under the 1850 act, for the original survey of the railroad clearly indicated that the Chicago branch of the charter line would terminate where the Chicago River meets Lake Michigan.

The county defendants argue that the only lands "selected" under the 1850 act were public lands that were the subject of a land grant made to the State of Illinois by the 1850 act. This interpretation of the language of the "lands exemption" would not include the nine parcels of land involved in the present case. These parcels were not subjects of the land grant made in the 1850 act; the railroad acquired most of the parcels from private parties between 1851 and 1883. Although the railroad acquired some land along the Chicago River from the Federal government in 1852, this acquisition was not associated with the 1850 act. The balance of the parcels in the terminal area are lands reclaimed from Lake Michigan by landfill.

The appellate court did not reach this issue, but both the Department and the circuit court adopted the county defendant's interpretation. We believe that this interpretation of the "lands exemption" best comports with this court's precedent and the language of both the charter and the 1850 act of Congress.

In order to determine which lands were the lands "selected" under the 1850 act, reference must be made to the language and structure of that act. The first section of the 1850 act granted a right-of-way through the public lands to the State of Illinois for the purpose of constructing a railroad from the junction of the Ohio and Mississippi rivers to the southern terminus of the Illinois and Michigan Canal, with separate branch lines to Chicago, Illinois, and Dubuque, Iowa. (9 Stat. 466-67, ch. 61 (1850).) It also provided that "a copy of the survey of said road and branches, made under the direction of the legislature, shall be for-

warded \*\*\* to the general land office at Washington city \*\*\*." (9 Stat. 466, ch. 61 (1850).) The railroad maintains that this survey establishes which lands were "selected" under the 1850 act of Congress for the purposes of applying the "lands exemption" in the charter. Because the lands in the terminal area were included in the original survey of the charter line, the railroad argues that they are among the lands "selected" and are thus exempt from taxation under the "lands exemption."

The railroad's interpretation, however, does not explain why the word "select" would be used in the "lands exemption" to refer to the lands surveyed under the act of 1850. The word "select" is used only once in that act, and it is not used in connection with the lands surveyed. The word is used solely in connection with certain public lands adjoining the railroad's right-of-way which were the subject of a land grant to the State of Illinois under section 2 of the 1850 act:

> "[T]here \*\*\* is hereby, granted to the State of Illinois, for the purpose of aiding in making the railroad and branches aforesaid, every alternate section of land designated by even numbers, for six sections in width on each side of said road and branches; but *in case it shall appear that the United States have,* when the line or route of said road and branches is definitely fixed by the authority aforesaid, *sold any part of any section hereby granted, or that the right of preemption has attached to the same, then it shall be lawful for any agent or agents to be appointed by the governor of said State, to select,* subject to the approval aforesaid, *from lands of the United States* most contiguous to the tier of sections above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or to which the right of preemption has attached as aforesaid, which lands, being equal in quantity to one half of six sections in width on each side of said road and branches, the State of Illinois shall have and hold to and for the use and purpose aforesaid." (Emphasis added.) (9 Stat. 466, ch. 61 (1850).)

Thus, the only lands that could have been "selected" under the Act of 1850 would be those parcels of land that were "selected" under the emphasized language set forth above in section 2 as substitutes for parcels adjoining the right-of-way which had already been sold or to which a right of preemption had attached. As noted above, the nine parcels in the terminal area, acquired mostly by landfill or from private parties, were not connected with the land grants made in section 2 of the 1850 act and thus would not qualify for exemption from taxation under the "lands exemption."

The language and structure of the Illinois Central charter support this interpretation of the language of the "lands exemption" contained in section 22 of that charter. Other provisions of the charter use the word "select" only to refer to the public lands outside the right-of-way which were granted by the United States to the State of Illinois in section 2 of the 1850 act. Section 15 first grants the right-of-way through the public lands and then separately grants "all the lands which may be *selected* along the lines of said road and branches *** under the grant made by the *** United States" in the act of 1850. (1851 Ill. Priv. Laws 66.) Section 19 of the charter also differentiates between the lands surveyed for the railroad's right-of-way and the lands "selected" under the act of 1850. (1851 Ill. Priv. Laws 71.) By distinguishing between the lands constituting the railroad's right-of-way and lands "selected" under the act of 1850, sections 15 and 19 of the charter establish that the latter can only be the public lands outside the right-of-way which were granted to the State of Illinois in section 2 of the act of 1850. There is no logical reason not to give the same phrase when used in section 22 this same meaning. (*Cf. In re Swigert* (1886), 119 Ill. 83, 87-88 (court, in *dictum*, implies that the "lands exemption" only applies to the lands originally granted to the railroad in the charter).

Only this interpretation of the "lands exemption" can explain why the legislature needed to create two exemptions in section 22 of the charter. As discussed above, the "general exemption" protects all property that is necessary and indispensable to railroad operations. There was no need to include a separate "lands exemption" in section 22 in order to exempt the lands constituting the right-of-way of the railroad. The lands granted under section 2 of the act of 1850, on the other hand, often were far removed from the charter line of the railroad. In some cases the ownership of these distant lands was retained by the railroad for many years after the charter line in the area was completed. (See, *e.g., Illinois Central R.R. Co. v. Goodwin* (1880), 94 Ill. 262 (railroad retained ownership of lands sold under contract of sale until entire purchase price paid).) The "lands exemption" was included to make clear that even though these lands might have a tenuous relationship to railroad operations, they were nevertheless exempt from taxation until sold *and* conveyed.

All of the cases that the railroad cites in support of its interpretation of the "lands exemption" are consistent with our interpretation of that exemption. For example, the railroad emphasizes that in *Illinois Central R.R. Co. v. County of Union* (1879), 94 Ill. 70, submerged lands were "selected" by the railroad under the act of 1850 even though the selection occurred many years after the grant of public lands in 1851 under the charter. *County of Union,* however, does not establish that all lands acquired by the railroad after 1851 can be lands "selected" under the act of 1850. The lands in *County of Union* were not private lands acquired by purchase and landfill, as most of the parcels in the present case are. They were public lands acquired under the grant in section 2 of the 1850 act. 94 Ill. 70, 72.

The railroad also argues that *Illinois Central R.R. Co. v. Rucker* (1853), 14 Ill. 353, 358, establishes that the rail-

road may locate its charter line on submerged lands that are to be reclaimed from Lake Michigan by landfill. *Rucker*, however, only dealt with the question of whether the railroad could use its condemnation powers to acquire such lands for this purpose. The case said nothing about the applicability of the "lands exemption" to the lands reclaimed. Other cases cited by the railroad are similarly inapplicable in the present context.

We conclude that the "lands exemption" in section 22 of the charter only applies to lands that were granted to the State of Illinois under section 2 of the 1850 act of Congress, and later conveyed to the railroad under the charter. The record shows that the railroad acquired the nine parcels in the terminal area in separate transactions and by landfill. Those parcels do not qualify for exemption from taxation under the "lands exemption."

II
THE PARCELS ARE "NON-CARRIER REAL ESTATE"
UNDER SECTION 79(4) OF THE REVENUE ACT OF 1939
AND ARE SUBJECT TO ASSESSMENT AND TAXATION
BY THE COUNTY DEFENDANTS FOR TAX YEARS
1971 THROUGH 1978.

Under the Revenue Act of 1939, local fiscal authorities like the county defendants may only assess real estate that is owned by a railroad if it is classified as "non-carrier real estate." (Ill. Rev. Stat. 1971, ch. 120, par. 564.) "Non-carrier real estate" includes all parcels of land and improvements on land that are not situated on the right-of-way of the railroad and are not used as "operating property." (Ill. Rev. Stat. 1971, ch. 120, par. 560(4).) Local authorities may not assess "operating property"—only the Department may assess such property. Ill. Rev. Stat. 1971, ch. 120, pars. 498, 561.

Thus, the county defendants may not assess the nine parcels of land in the terminal area if they are "operating property" as defined in the Act. Section 79(2) of the Act provides:

> *"The term 'operating property' shall mean and include all* tracks and right of way, all structures and improvements on such right of way, all rights and franchises, all rolling stock and car equipment, and all other property, real or personal, tangible or intangible connected with or used in the operation of the railroad including *real estate contiguous to railroad right of way or station grounds held for reasonable expansion or future development."* (Emphasis added.) Ill. Rev. Stat. 1971, ch. 120, par. 560(2).

The evidence presented before the Department was not challenged for either truthfulness or accuracy. Consequently, the decision as to whether the nine parcels are "operating property" depends solely upon an application of the appropriate legal standard to the undisputed facts. *Cf. Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 566.

The Department held that for tax year 1971 the nine parcels of land were not "operating property" because they were vacant and were not held by the railroad for reasonable expansion or future development. Reversing the Department's decision, the circuit court and the appellate court held that the nine parcels were "operating property" in 1971. (101 Ill. App. 3d 414, 420-21.) They went on to hold that the nine parcels also were "operating property" in the years 1972 through 1978. We reverse these court decisions because the undisputed evidence in the record establishes that the nine parcels of land in the terminal area were not held for reasonable expansion or future development of the railroad during tax years 1971 through 1978.

Substantial credible evidence in the record proves that for the most part the nine parcels in the terminal area were vacant during the years 1971 through 1978. The railroad stipulated that it "does not dispute that the lands *** were in fact vacant parcels as of January 1, 1971 ***." Some evidence in the record suggests that tracks may have been located on three of the nine parcels some-

time after 1972, but even if that were so, nothing in the record indicates that they were ever used for any railroad business.

For vacant property to be "operating property" it must be "held for *reasonable* expansion or future development." (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 120, par. 560(2).) This statutory definition of "operating property" codified this court's decision under a prior statute in *People ex rel. Seip v. Chicago & Western Indiana R.R. Co.* (1886), 116 Ill. 181. Under the prior statute all "railroad track" was assessable by the State while most other railroad property was assessable by the local fiscal authorities. In *Seip* this court held that vacant parcels of land could be "railroad track" when they were "circumstanced as all this was, the road being in process of construction, and *the property in good faith acquired and held for right of way*, and the delay of its immediate use for such purpose coming only from the non-acquirement of intervening property which was being obtained ***." (Emphasis added.) 116 Ill. 181, 185.

Expressions of the railroad's intent to use vacant property are relevant for the purpose of determining why the vacant property is held. For the property to be "operating property," however, the railroad's intent to hold the vacant property for railroad purposes must be reasonable and in good faith. In determining whether the railroad's intent is reasonable we should consider, among other things, whether its intent to hold the vacant property for railroad purposes is substantial when compared with its intent to hold the property for other purposes. *Cf. St. Louis Bridge Co. v. Becker* (1939), 372 Ill. 102, 109 (when bridge owned by a railroad is used both for railroad purposes and for other purposes it is nevertheless "operating property" when the railroad use is the principal use and the other use is merely an incidental use).

In arguing that it intends to hold the nine parcels in the

terminal area for future railroad use, the railroad relies heavily upon its interpretation of the structure of the two contracts under which the property in the terminal area was sold. The contracts provide for conveyance of the parcels at indeterminate intervals over a 20-year period. The railroad argues that this long conveyance period will permit it to use the nine parcels for railroad purposes if the need should arise. Indeed, the railroad argues that the contracts actually contemplate such use because each provides that "[u]ntil the consummation of sale of any particular portion of the property which is subject to the terms of this Agreement, Railroad shall have full use thereof for the continued conduct thereon of its railroad operations and uses incidental thereto * * *."

We believe that the structure of the two land sale contracts supports the contrary finding—that the railroad was not holding the nine parcels for railroad purposes during the period 1971 through 1978. Although the quoted provision in the contracts does reserve the use of each parcel for railroad purposes until it is conveyed, the contract also provides for conveyance of any or all parcels at any time at the sole option of the developers. The railroad can hardly rely on the availability of the parcels for future railroad development if the developers, at any time, can acquire title, terminating all the railroad's rights to use the property.

Substantial evidence in the record also supports a conclusion that the sales transactions were not extended over 20 years in order to reserve the possibility the parcels could be used for railroad purposes. The purpose of the 20-year term was to permit construction by the city and by the railroad of the over $100 million worth of streets, utilities and public conveniences that were necessary to sustain private development of the terminal area. Requirements in the sales contracts that the purchasers take at least a specified percentage of the property at various intervals over

the 20-year period are linked to and limited by actual progress in the public works construction program and not to relocation of railroad operations. Moreover, a railroad representative, Mr. Wence Cerne, admitted in proceedings before the Illinois Commerce Commission that the railroad had retained title to the property over the 20-year period because the city of Chicago had favored this unified ownership structure as the most desirable situation for carrying out the public utility construction program. The opportunity, if any existed, for continued use of the parcels for railroad purposes was merely temporary and incidental to this overall development scheme.

Moreover, in order to obtain approval of these contracts by the Illinois Commerce Commission the railroad admitted that the property in the terminal area was not necessary for its present operations or for future expansion or development of the railroad. The railroad's petition seeking approval of the sale admitted that "Petitioner has no present or future need for said property with respect to the operations of its railroad; and sale of said property will not interfere with the Petitioner's duties as a public utility." The general counsel and a vice president of the Illinois Central Railroad each attested to the accuracy of this petition under oath.

In support of this petition, Allen L. Sams, vice president and chief engineer of the IC, testified under oath that the sale of the property in the terminal area would not detract from the ability of the IC to conduct its railroad operations:

> "The passage of time has demonstrated a declining need for the type of operations now conducted in the area, which is the subject of these proceedings.
>
> Termination of our less-than carload freight service several years ago removed the need for some operations.
>
> Construction of express highways has reduced the need for shippers and receivers of freight to locate near the central business district.

It has become increasingly difficult to find tenants for the various warehouses located upon the property and we anticipate that this trend will continue.

The amount of switching done in the area continues to decline, and we anticipate that ultimately the area south of Randolph Street will be adequate for our needs.

Our operations and other property holdings in the greater Chicago area, including those south of Randolph Street, are such that we anticipate no difficulty in gradually relocating operations as the property involved is sold.

In the area required for operation of our suburban trains, and those are the Chicago South Shore and South Bend Railroad, only air rights will be sold, and space at ground surface will be retained for railroad operations."

Mr. Sams concluded that the property to be sold was neither necessary nor useful to the railroad in the performance of its duties to the public.

The railroad has attempted to mute the impact of its admissions in the ICC proceedings by submitting numerous affidavits and documents detailing the railroad's efforts, largely unsuccessful, during the period 1971 to 1978 to procure business for the facilities in the terminal area. The county defendants argue that much of this evidence is irrelevant and immaterial because it refers generally to the facilities in the terminal area without specifying that any of the new business would require development on any of the nine vacant parcels which are the subject of this litigation. Evidence of the railroad's intent to use facilities on property that is contiguous to the nine vacant parcels is of less persuasive value than direct evidence of the railroad's intent and ability to use the vacant parcels for expansion, but we believe that such evidence nevertheless is relevant and admissible on the issue of whether the vacant parcels are held for reasonable expansion or future development. The trier of fact should, however, take into account the weakness of this kind of evidence in weighing it with all the other evidence in the case.

By affidavit, Keith Osterdock, general manager of

transportation for the railroad, observed that the facilities in the terminal area are "primarily intended to be used to accommodate 'TTX' or team track cars. The applicable Interstate Commerce Commission tariff represents [the terminal facility] as being available for team track use, which is a method of freight transfer incorporating direct trailer-railroad car contact, and which does not employ a loading dock. *** There are distinct possibilities that the [terminal facility] will be actively used for team track purposes when business requires it." These observations were partially corroborated in the affidavit of Keith R. McCullagh, manager of industrial development, and by submission of the relevant ICC tariff schedules.

The affidavits of two other railroad employees, however, establish that between 1971 and 1976 the railroad was largely unsuccessful in procuring business for the facilities in the terminal area. Until 1972 Claude J. Manson was the senior account manager for freight sales. Between 1969 and 1972 he negotiated with Standard Oil of Indiana, U.S. Steel and U.S. Gypsum regarding the possible delivery by rail of construction materials for the Standard Oil Building, the Sears Tower, and other construction sites in downtown Chicago. The record indicates that only U.S. Gypsum made significant use of the facilities for this purpose; between 1969 and 1972 wallboard manufactured by that company was delivered to the terminal facility for use in adjacent construction sites.

Between October 1970 and May 1971 the Standard Oil Company did use two of the parcels involved in this litigation as a site for storing materials used in constructing the Standard Oil Building. Some construction materials were delivered to the storage sites by rail. The use of these two parcels, however, was directly related to their proximity to the construction site, and this temporary use of the parcels by a licensee for construction operations had very little to do with the long-term viability of the terminal area's rail-

road facilities. This use was in reality the use of the property for construction purposes and not for railroad purposes.

Eugene E. Harmon was manager of market development for the railroad between 1974 and 1976. During that period he negotiated with Crown-Zellerbach Corp., Westvaco, Georgia-Pacific Co. and unspecified paper manufacturers in Wisconsin concerning the possible use of the terminal area for paper shipments. The record indicates that only Crown-Zellerbach decided to use the facilities; between 1974 and 1976 it had several shipments of paper delivered by rail to the terminal area for delivery to distribution points.

The affidavits of the railroad's employees indicate that the railroad intends to obtain whatever revenue it can from the existing facilities in the terminal area pending completion of the public works construction program. This sporadic use of the terminal facilities, however, does not establish that the nine vacant parcels are held for *reasonable* expansion or future development. In fact, the record indicates that the development plan has provided for the availability of 400,000 square feet of space in the terminal area for railroad use after 1990, but it appears that none of the nine parcels will be used in this dedication.

In conclusion, the manifest weight of the evidence establishes that the nine vacant parcels in the terminal area are not held for reasonable expansion or future development of the railroad. In its petition to the ICC seeking approval of the sale of land in the terminal facility, the railroad admitted that it had no present or future need for the property. The structure of the contracts of sale also indicated that the railroad was not relying on the availability of the facilities for railroad use. This evidence is certainly more persuasive than the hopes expressed by railroad officials that they might develop a railroad use for the parcels in the future when for so many years their efforts added

up to nothing more than futility.

The little railroad use that did occur between 1971 and 1978 was sporadic, and nothing in the record indicates that development of the nine vacant parcels will be necessary to handle the traffic expected over the 20-year period of the sales contracts. In short, the great preponderance of activity in the terminal area is no longer related to railroad use, but to the construction of public utilities and to the ultimate development of the area by private developers. Whatever may be true of the other parcels in the terminal area, we conclude that the Department's finding that with respect to the tax year 1971 these nine parcels were not held for reasonable expansion or future development of the railroad is supported by the manifest weight of the evidence, while the contrary finding of the circuit court with respect to the tax years 1972 through 1978 is against the manifest weight of the evidence. Because the parcels are not "operating property," but "non-carrier real estate" the county defendants may assess and tax the parcels for tax years 1971 through 1978.

### III
#### THE ACT CREATING THE DEPARTMENT OF LOCAL GOVERNMENT AFFAIRS IS CONSTITUTIONAL

Article IV, section 13, of the Illinois Constitution of 1870 provides in part that "no law shall be revived or amended by reference to its title only, but the law revived, or the section amended, shall be inserted at length in the new act." (Ill. Const. 1870, art. IV, sec. 13.) The ICG contends that an act adopted in 1969 which created the Department of Local Government Affairs violated the prohibition against amendment by reference and that all acts of that department and all proceedings before it are unconstitutional and void. The essence of the railroad's claim is that the 1969 act transferred powers from one State department to another without setting forth at length the provisions describing the powers transferred. Consideration

of the merits of the railroad's claim of unconstitutionality requires a review of the sequence of legislative acts that resulted in the creation of the Department.

Until 1967 the Department of Revenue had the power to administer the charter exemptions and the railroad property classifications in the Revenue Act of 1939. In that year the legislature created a new division of the Department of Revenue and assigned to it these and other powers. The legislature accomplished this transfer by "An Act creating the Division of Local Governmental Affairs and Property Taxes in the Department of Revenue, defining its powers and duties, and creating the position of Superintendent of the Division." (1967 Ill. Laws 332, Ill. Rev. Stat. 1967, ch. 127, pars. 39b41 through 39b44.) Section 2 of this act provided that in addition to its many other powers the new division "shall have the power and duty to *** [p]erform all other duties and powers relating to real and personal property taxes, including real and personal property assessments *** as are provided by law and may be vested in the Department of Revenue." Ill. Rev. Stat. 1967, ch. 127, par. 39b42.

In 1969, the legislature passed Public Act 76—1158 creating a new department, the Department of Local Government Affairs, and transferring to it all the powers that had been exercised by the Division of Local Governmental Affairs of the Department of Revenue as well as other powers that had been exercised previously by other State administrative departments. (Pub. Act 76—1158, 1969 Ill. Laws 2320-32, Ill. Rev. Stat. 1971, ch. 127, pars. 63b14 through 63b14.18.) To achieve this transfer of powers to the new department, the legislature added section 68.3 to the Civil Administrative Code of Illinois (Ill. Rev. Stat. 1971, ch. 127, par. 63b14.3). That section listed the names of 13 acts containing powers that other State departments had exercised in the past, but that would hereafter be exercised by the Department of Local Government Affairs.

In particular, the section provided that the Department would have the power "[t]o exercise the rights, powers and duties vested by law in the Department of Revenue under 'An Act creating the Division of Local Government[al] Affairs and Property Taxes in the Department of Revenue, defining its powers and duties, and creating the position of Superintendent of the Division,' approved April 25, 1967, as heretofore or hereafter amended; \*\*\*." Ill. Rev. Stat. 1971, ch. 127, par. 63b14.3(11).

The railroad argues that the 1969 act establishing the new department violated the constitutional prohibition against amendment by reference because it transferred the powers described in the 1967 act from one State department to another without setting forth at length the provisions describing the powers tranferred. The railroad also asserts that both the 1967 and the 1969 acts are unconstitutional because they transfer the power to administer the assessment and property taxation provisions of the Revenue Act of 1939 without setting forth at length the provisions creating the powers transferred. Neither of these contentions have merit.

The 1969 act constituted independent legislative action adding new provisions to the Civil Administrative Code of Illinois and setting forth the powers of the newly created State department, the Department of Local Government Affairs. In transferring the powers described in the 1967 act and the Revenue Act of 1939 from a division of the Department of Revenue to the Department of Local Government Affairs, the 1969 act was complete in itself, and it did not purport to amend the substance of either act in any way. "It is well established \*\*\* that an act which is complete in itself and does not expressly amend a prior statute, although it may do so by implication, does not violate section 13 of article IV of the Illinois constitution of 1870." *People ex rel. Kucharski v. Hiering* (1971), 49 Ill. 2d 304, 307.

The device that the legislature used in this case to transfer powers from one administrative department to another is indistinguishable from the series of legislative acts that this court upheld as constitutional in *People ex rel. McDonough v. Beemsterboer* (1934), 356 Ill. 432, *cert. denied* (1934), 293 U.S. 575, 79 L. Ed. 673, 55 S. Ct. 86. The legislature had passed two acts that together abolished the State Board of Equalization and transferred its powers to the newly created State Tax Commission. The first act created the new commission and added a provision to "An Act in relation to the civil administration of the State government ***" (now the Civil Administrative Code of Illinois) stating that the Commission "shall *** exercise and discharge all duties now or hereafter imposed by law on it with reference to the assessment of property for taxation." (1919 Ill. Laws 13.) The second act enumerated many of the specific powers and duties that were to be exercised by the new commission and also, by the following provision, made a blanket transfer of all other powers and duties from the old Board of Equalization to the new Tax Commission:

"On or after the taking effect of this Act all the powers and duties now conferred or imposed upon the State Board of Equalization *** in relation to the assessment of property for taxation shall be transferred to and thereafter shall be exercised and performed by the Tax Commission." 1919 Ill. Laws 724.

In *Beemsterboer* the court held that the act transferring powers to the State Tax Commission did not violate the constitutional prohibition against amendment by reference. The taxpayer had argued that this act was unconstitutional because it amended portions of the Civil Administrative Code of Illinois and the Revenue Act without setting forth at length the provisions affected by the amendments. The court responded to the taxpayer's position by stating:

"The purpose of the constitutional provision [prohibiting amendment by reference] is to avoid confusion arising

from patchwork legislation but does not require practically endless reiteration of amended statutes, nor that when a new act is passed all prior acts in any way modified by it shall be published at length in the amendatory act. [Citation.] Where a new law is complete in itself and entirely intelligible without reference to prior legislation it is valid though incidentally its effect is to modify existing law. [Citations.]

*** The act is entitled, 'An act in relation to the assessment of property for taxation.' It does not purport to amend any other law and is an independent act in itself as to the subject with which it deals. Although it may have the practical effect of modifying prior acts, that fact does not place it within the inhibition of the constitution. [Citations.]'' 356 Ill. 432, 435-36.

In the present case, the railroad emphasizes that the structure of the 1969 act creates danger of confusion and causes considerable inconvenience to the public. The statute requires that several acts be read before one can determine the specific powers of the Department of Local Government Affairs. This result, however, is no different than the statute upheld in *Beemsterboer*. Any inconvenience caused by the failure to set out fully the powers transferred in those acts simply reflects the basic organizational structure of the Civil Administrative Code of Illinois. That code provides an essential organizational road map to the State's bureaucracy, but it does not purport to describe exhaustively the powers of every State department. (See *E. A. Aaron & Brothers v. McKibbin* (1946), 392 Ill. 558 (Retailers' Occupation Tax Act does not unconstitutionally amend by reference the Civil Administrative Code of Illinois even though it grants the Department of Finance powers that are not included in the enumeration of the Department's powers listed in the Code).) The legislature's use of the title of the 1967 act in order to summarize the powers conferred on the newly created Department of Local Government Affairs is also consistent with other provisions of the Civil Administrative Code of Illinois, where ti-

tles of acts frequently are used to cross-reference the substantive powers of State departments which are incorporated in separate acts of the legislature. See, *e.g.*, Ill. Rev. Stat. 1971, ch. 127, pars. 39b through 39b33 (Department of Revenue has power to administer the provisions of various acts which are named by title only).

We do not agree that the failure to enumerate at length the specific powers transferred to the Department of Local Government Affairs in the 1969 act was an "enactment *** 'in terms so blind' that the legislature itself might be deceived." (*People ex rel. Rose v. New York Central R.R. Co.* (1961), 22 Ill. 2d 266, 280.) Moreover, the legislature safeguarded against any danger of confusion to the public when, in a separate act, it amended the provisions of the Revenue Act of 1939 by substituting the name of the Department of Local Government Affairs wherever the name of the Department of Revenue had previously appeared. (Pub. Act 76—2254, 1970 Ill. Laws 417.) We therefore conclude that the 1969 act creating the Department of Local Government Affairs did not violate the prohibition against amendment by reference in article IV, section 13, of the 1870 Constitution. (To avoid confusion, we note that in 1979 the Governor abolished the Department of Local Government Affairs by executive order and transferred its powers to other State departments. See Executive Order No. 3 (1979), reprinted in Ill. Rev. Stat. 1981, at 7060-63.)

IV
CONCLUSION

For the reasons noted above we hold that the nine parcels of land involved in this case are not exempt from taxation under section 22 of the Illinois Central charter. Moreover, the county defendants may assess and tax these nine parcels for tax years 1971 through 1978 because the parcels are properly classified as "non-carrier real estate" under section 79 of the Revenue Act of 1939. Finally, we hold that the 1969 act creating the Department of Local Gov-

ernment Affairs did not violate the prohibition against amendments by reference contained in article IV, section 13, of the 1870 Constitution.

Accordingly, we reverse the judgments of both the appellate and circuit courts.

*Judgments reversed.*