(No. 40103.—

American College of Surgeons, Appellee, *vs.* Bernard J. Korzen, County Collector, *et al.,* Appellants.

*Opinion filed January 19, 1967.*

WARD, J., took no part.

DANIEL P. WARD, State's Attorney, of Chicago, (EDWARD J. HLADIS and DONALD J. VEVERKA, Assistant State's Attorneys, of counsel,) for appellants.

PAUL G. GEBHARD and MICHAEL G. BEEMER, both of Chicago, (VEDDER, PRICE, KAUFMAN & KAMMOHOLZ, of counsel,) for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The American College of Surgeons, a not-for-profit corporation of Illinois, filed a complaint in the circuit court of Cook County seeking to enjoin the county treasurer and other officials from collecting taxes on its property for the years 1963 and 1964. The court held that plaintiff's property was used for charitable and beneficent purposes and declared it tax exempt for the years stated. The revenue being involved, defendants appeal directly to this court.

From 1930 until 1963, plaintiff was located at 40 East Erie Street in Chicago, and its property was exempted from tax. When plaintiff moved into its present quarters at 55 East Erie Street, the county assessor and the board of appeals of Cook County determined that the new premises should also be exempt from taxation, but the Department of Revenue refused to approve the exemption.

Defendants argue that plaintiff is precluded from seeking equitable relief because the Department's refusal to approve the exemption was a final administrative decision judicially reviewable only under the Administrative Review Act. They assert that section 138 of the Revenue Act, (Ill. Rev. Stat. 1965, chap. 120, par. 619,) makes the Administrative Review Act applicable and that section 2 of that act, (Ill. Rev. Stat. 1965, chap. 110, par. 265,) makes it the exclusive method of review. In *People ex rel. Hillison* v. *Chicago, Burlington and Quincy Railroad Co.* 22 Ill.2d 88, we said that the legislature, in making the Administrative Review Act applicable, was thinking primarily, if not exclusively, of administrative divisions relating to the original assessment of property by the Department. We are of the opinion that the Administrative Review Act is not here

applicable, since it is not an original assessment by the Department.

The next question is whether plaintiff is entitled to relief in a court of equity. The settled rule is that equity will not enjoin the collection of a tax unless special grounds for equitable jurisdiction exist, such as an unauthorized levy, taxes levied on a fraudulently excessive valuation, a tax laid upon exempt property, or where irreparable injury will result, (*Bowman* v. *County of Lake,* 29 Ill.2d 268; *Hodge* v. *Glaze,* 22 Ill.2d 294; *Lakefront Realty Corp.* v. *Lorenz,* 19 Ill.2d 415; *Owens-Illinois Glass Co.* v. *McKibbin,* 385 Ill. 245.) This court has held that "Injunction is a proper remedy where the property owner alleges that the tax is levied upon property not subject to taxation." (*City of Mattoon* v. *Graham,* 386 Ill. 180, 181; *Springfield Housing Authority* v. *Overaker,* 390 Ill. 403.) Plaintiff not only maintains that its property is tax exempt but, as heretofore noted, it was in fact exempted from 1930 until the Department refused to approve the exemption on the new property in 1963. We conclude that equity had jurisdiction of this cause.

The substantive question is whether the plaintiff's property is used for purposes which make it exempt from tax. Plaintiff contends that it is a beneficent and charitable organization and that the property is used exclusively by the organization to carry out its "charitable", "beneficent", and "educational" purposes, as those terms are used in sections 19, 19.1, and 19.7 of the Revenue Act. Ill. Rev. Stat. 1965, chap. 120, pars. 500, 500.1 and 500.7.

The plaintiff organization was incorporated as a not-for-profit Illinois corporation in 1912 and presently has some 26,000 members. In 1930, when its property was first declared tax exempt, it had amended its articles of incorporation, the pertinent portion of which still provide as follows:

"4. The purpose or purposes for which the corporation is organized is to establish and maintain an association of surgeons, not for pecuniary profit but for the benefit of humanity by advancing the science of surgery and the ethical and competent practice of its art; by establishing standards of hospital construction, administration and equipment, and all else that pertains to them; by engaging in scientific research to determine the cause, nature and cure of diseases; by aiding in better instruction of doctors; by formulating standards of medicine; and methods for the improvement of all adverse conditions surrounding the ill and injured wherever found. To accomplish these benevolent and charitable aims, it shall be within the purposes of this corporation to use those means which from time to time may seem to it wise, including research, education, the establishment and maintenance of libraries, museums, and other agencies or institutions appropriate hereto, and the cooperation of any other such activities, agencies or institutions already established or which may hereafter be established.

"5. In the event of the dissolution of the corporation, all of its remaining assets shall be distributed exclusively for charitable, scientific or educational purposes."

The record shows that the first floor of the building contains a library and a museum. The library contains approximately 14,000 volumes, about one half of which are devoted to medical and surgical history and the remainder being rare books or general reference books, a portion of which, at least, were acquired by gift. The museum consists of some 500 objects of historical importance, including surgical instruments, photographs, historical letters and the like. In 1963 a $43,000 bequest was received for the support of the library. Both the library and the museum are open to, and used by, the general public.

The college maintains a library of 325 different surgical films which are available to hospitals and meetings of nurses, medical and para-medical groups at a maximum

service charge of $6 to cover postage and insurance. Many of these films were acquired through donations by the surgeons who produced them.

The college's cancer committee conducts a national program for the improved care of cancer patients by hospitals, doctors and cancer centers. It formulates standards for cancer treatment facilities and inspects and accredits State, municipal, Federal, and private hospital facilities meeting such standards. This program is not duplicated by any governmental or private agency, and there is no charge made for the survey or approval of facilities. The committee has compiled and from time to time revises a "Manual for Cancer Programs" which covers the entire management of the cancer patient in the hospital. Single copies of the manual are free while additional copies are available for 50¢ per copy. The cancer program has received substantial financial support from both public and private charities, including the National Cancer Institute, the United States Public Health Service, and the American Cancer Society.

The trauma committee of the college conducts a program for education of doctors, laymen, hospital administrators, and the general public in treatment and prevention of injuries and the care and transportation of injured persons. This committee also publishes pamphlets and handbooks dealing with treatment of injuries, and basic standards and requirements for hospital emergency departments, many of which are available without charge to anyone who may wish to obtain them. Two four-day.courses are presented by the committee; one directed primarily at general practitioners, and the other, a practical course conducted in co-operation with the Chicago Fire Department, is attended by firemen, policemen, ambulance attendants, rescue squads, and undertakers from all over the country.

In addition to the foregoing activities, the college conducts an educational program in pre-operative and post-operative care, offers scholarships to support the training

of young surgeons, especially those who show promise of being good teachers in medical schools and have exhausted their own funds, and provides special surgical residency training which is not provided by medical schools. The college instituted a program for the accreditation of hospitals in 1918 and has continued to develop a set of standards for hospitals. This program was administered by the college alone until 1953, when it was transferred to the Joint Commission on Accreditation of Hospitals which is jointly supported by, and responsible to, the college and three other medical organizations. Internships can be served only in hospitals which are accredited, and no public or private organization conducts a similar accreditation program.

Finally the college organizes and administers scientific meetings for the post-graduate education of physicians, surgeons, surgical residents and nurses, as well as conducting its annual clinical congress, a five-day series of programs consisting of lectures, panel discussions, surgical motion pictures and other similar activities, open to attendance by both members and nonmembers.

The college does not recruit members, but rather, surgeons make application, submit records of training credentials, and gain approval of local surgical colleagues as to surgical judgment and proficiency. The annual dues are $40, which sum is reduced for foreign doctors and doctors in government service and eliminated for foreign missionaries. It does not compile data in regard to fees, has adopted no suggested fee schedule, conducts no programs relating to the economics of medicine and surgery or the business aspects of the practice of surgery, has no grievance committee, conducts no lobbying activities, and supports no candidates for public office.

In 1963, the college received $186,600 in gifts from public and private charity and had a carryover of grants and donations from prior years for work in progress in the amount of $251,135, and in 1964 such grants totaled

$282,000. The college has never had capital stock or shareholders, has never declared dividends, or ever been organized for profit. Since 1925, the Federal government has recognized the college as an exclusively charitable or educational organization under the Internal Revenue Code (Int. Rev. Code of 1954, sec. 501(c)(3),) and eligible to receive tax deductible gifts and bequests.

Defendants point out that initiation fees, dues, and application fees provided over half of the funds actually received in 1963. Other sources of income, in addition to dues and gifts from charities, include income from investments, and from publication of a scientific journal. However, members pay the same subscription price for the journal as nonmembers and the income received from this and other publications is used to pay the expenses of the publication and for updating its material.

Plaintiff's primary claim for exemption is made under section 19.7 of the Revenue Act which provides that "All property of institutions of public charity, all property of beneficent and charitable organizations, * * * when such property is actually and exclusively used for such charitable and beneficent purposes, and not leased or otherwise used with a view to profit" shall be exempt from taxation. (Ill. Rev. Stat. 1965, chap. 120, par. 500.7.) In order to qualify its property for exemption as a charitable institution, plaintiff must prove that it is owned by a beneficent and charitable organization and that it is used exclusively for charitable purposes and not leased or otherwise used with a view to profit. (*Milward* v. *Paschen,* 16 Ill.2d 302; *Rotary International* v. *Paschen,* 14 Ill.2d 480.) The law recognizes as charitable those purposes which will benefit an indefinite number of persons either by the influence of education or religion, or by relieving their bodies from disease, suffering and constraint, or by erecting or maintaining public buildings or works, or by otherwise lessening the burden upon the State to care for and advance the interests of its citizens.

(*Milward* v. *Paschen,* 16 Ill.2d 302; *Rotary International* v. *Paschen,* 14 Ill.2d 480; *International College of Surgeons* v. *Brenza,* 8 Ill.2d 141.) We have heretofore followed earlier decisions which said that the distinctive characteristics of a charitable organization are that it has no capital, capital stock, or shareholders, earns no profits and pays no dividends, but derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter. (*Milward* v. *Paschen,* 16 Ill.2d 302). Plaintiff has these characteristics except that approximately one half of its funds come from dues of members.

A careful reading of the cases indicates that while the source of funds is listed as a characteristic of a charitable organization, each concerns itself primarily with discovery of the facts relative to the use to which the funds are put. For example, in *Rotary International* there was no requirement in its objects that funds should be devoted to charitable purposes; *International College* found that funds derived from membership dues were held primarily for the benefit of members; the *Milward* case stressed that the foundation's function was primarily to serve the mortuary profession and not directly for the benefit of mankind. In final analysis, the cases may be read to mean that where funds are principally derived from dues of members such funds are *per se* held primarily for the benefit of the members rather than in trust for the benefit of the public. We think, however, a better view is that where it is established that the funds and property are devoted to public purposes, the source of the funds is not the sole determinant factor.

Although many of its programs are attended primarily by members of the medical profession, the college makes the benefits available to the public to the greatest degree possible, and more people than just its members are benefited. The library, publications, training, educational, and accreditation programs relieve, to some extent, the burden

on the State to advance the interest of its citizens. In this respect this case is substantially different from *International College* where exemption was denied. In that case the only activities shown were the use of its property for meetings and distribution of literature, and the intention of developing it for exempt uses.

We conclude from all the evidence that plaintiff is organized and operating as a charitable and beneficent organization, and that its property is used for charitable purposes. The judgment of the trial court exempting the property from tax and enjoining the collection thereof for the years 1963 and 1964 is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.