HIGHLAND PARK HOSPITAL *et al.*, Plaintiffs-Appellants, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

Second District No. 2—85—0980

Opinion filed May 6, 1987.

DUNN, J., dissenting.

Julian Johnson, of Snyder, Clarke, Dalziel & Johnson, of Waukegan, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Kathryn A. Spalding and Roma Jones Stewart, Assistant Attorneys General, of counsel), for appellee Department of Revenue.

Fred L. Foreman, State's Attorney, of Waukegan (Kristine Short, Assistant State's Attorney, of counsel), for appellee County Board of Review of Lake County.

JUSTICE REINHARD delivered the opinion of the court:

Plaintiff, Highland Park Hospital (hospital), is an Illinois not-for-profit corporation providing hospital and health services. In December 1979, the hospital took title to the subject property, which was later developed into the Grove Professional Center (Professional Center), a medical center located in Long Grove, Illinois. The hospital transferred the property in November 1982 to plaintiff, Groveland Properties, Inc., a not-for-profit corporation set up to manage other

property acquisitions of the hospital and its parent corporation, Lakeland Health Services. On December 30, 1982, the hospital filed a petition for exemption from taxation for the Professional Center for 1982 and subsequent years with the board of review of Lake County, Illinois (board). The petition claimed that the property was exclusively used for charitable purposes and was exempt under section 19.7 of the Revenue Act of 1939 (Ill. Rev. Stat. 1981, ch. 120, par. 500.7). After a hearing, the board allowed a 50% exemption for the part of the Professional Center used by the hospital, pending confirmation by the Illinois Department of Revenue.

The Department of Revenue initially disapproved the exemption, finding that the property was not an exempt use. Following a hearing which was held February 2, 1984, the Department again denied the exemption on second review. Plaintiffs filed an action for administrative review in the circuit court of Lake County. The circuit court affirmed the decision of the Department of Revenue, and plaintiffs appeal.

The property in question is a three-story brick building with a total of 29,601 square feet. The building, along with service roads and parking areas, is situated on approximately eight acres in the village of Long Grove in Lake County, Illinois. The Professional Center is owned and managed by plaintiff Groveland Properties, Inc., for the hospital. Both Groveland Properties, Inc., and the hospital are not-for-profit subsidiaries of Lakeland Health Services, Inc. Any funds acquired by Groveland Properties, Inc., in excess of operating expenses are turned over to the Highland Park Hospital Foundation, the fund-raising and development subsidiary of the group.

In 1980, due to decreasing patient admissions, the hospital conducted a feasibility study prior to construction of the Professional Center. The study concluded that the area around the Professional Center needed more than 20 additional physicians and that patient referrals from those physicians would meet the hospital's admissions goal. To assure the community of quality medical care and to increase hospital admissions, physicians renting space at the Professional Center are required to be members of the hospital staff and are required to refer patients to the hospital when safely possible.

Construction on the Professional Center began in late 1980, and the first tenants moved in in late 1981. The first floor houses an Immediate Care Center, a laboratory, a pharmacy, a radiology facility, and two physicians' offices. There is also a mail room, a lobby and waiting area, and mechanical spaces for the heating, air conditioning, and ventilation equipment of the building.

The Immediate Care Center is a walk-in clinic open seven days a week, 12 hours a day (8 a.m. to 8 p.m.). It is owned and operated by the hospital and is maintained by physicians on the staff of the hospital. The physicians renting space at the Professional Center, however, are not required to serve in the Immediate Care Center. The Immediate Care Center is equipped to treat minor ailments and emergencies, but is not set up for life-threatening emergencies such as myocardial infarctions. In 1982, approximately 5,000 patients were treated in the Immediate Care Center.

The laboratory provides some of the basic testing for patients of the Professional Center's physicians and for patients of the Immediate Care Center. The laboratory also conducts some of the testing for patients at the hospital. The laboratory is characterized as a satellite of the hospital laboratory, and, although the complaint for administrative review states that the laboratory is rented, the evidence presented before the board of review indicated that no rent is received from the laboratory.

The pharmacy and radiology unit are both rental units, as are the physicians' suites. While the board of review's initial grant of exemption included the radiology unit, plaintiffs now concede that neither the pharmacy nor the radiology unit are entitled to exemption.

The second floor contains more physicians' offices, a community room, and an exercise room. The community room accommodates 40 to 50 people and is available to residents of the community at no charge for programs and meetings. The hospital also conducts a series of health education programs in the community room which are open to the public. The community room produces no income.

The exercise room has a dual purpose. It is open to patients of the Professional Center's physicians. Also, the hospital conducts exercise programs, weight control programs, and aerobics classes, all of which are open to the public. It produces no income, although a fee is charged to pay an outside instructor. The third floor consists entirely of physicians' suites.

All patients of the Immediate Care Center are initially billed for their treatment. Bills are sent out every 15 to 30 days, and patients are contacted by telephone if no payment is made after 90 days. At this point, if patients can prove an inability to pay, the collection process will stop, and the hospital will write off that particular charge. Otherwise, formal collection efforts begin. The Immediate Care Center generated $106,885 in patient revenues in 1982. Of that amount, $6,000, or approximately 6%, was uncollectible and written off as free care.

Several advertisements for the Immediate Care Center were utilized by plaintiffs to promote the center. Essentially, these advertisements stated the hours that the facility was open, the availability of care without an appointment, the nature of the services provided, and the relative low cost of the services compared to other medical facilities. It is further stated that private health insurance will probably cover the cost, or a Visa or Master Card may be used. No mention is made of free care for those unable to pay.

The circuit court in this case found that the Department of Revenue's denial of exemption was "not against the manifest weight of the evidence."

Defendants first urge that this court also defer to the Department of Revenue's decision unless it is against the manifest weight of the evidence. Hearings in this matter were held before both the Lake County board of review and the Illinois Department of Revenue. No disputed testimony or documentary evidence was presented at either hearing. The only witness, other than those from the hospital, was an employee of the Department of Revenue who testified as to the criteria he employed in determining that the property in question was not primarily used for charitable purposes. The evidence presented by plaintiffs was not challenged for truthfulness or accuracy.

■ Because the relevant facts are uncontradicted, "[t]he issue before us is not whether the Department's [of Revenue's] decision was against the manifest weight of the evidence. When the facts upon which a decision of tax exempt status rests are undisputed, whether property is exempt is a question of law." (*Cook County Masonic Temple Association v. Department of Revenue* (1982), 104 Ill. App. 3d 658, 660, 432 N.E.2d 1240; see also *Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 566, 194 N.E.2d 257.) Thus, the decision as to whether the property is exempt "depends solely upon an application of the appropriate legal standard to the undisputed facts." *Illinois Central Gulf R.R. Co. v. Department of Local Government Affairs* (1983), 95 Ill. 2d 111, 129, 447 N.E.2d 315.

The Lake County board of review has taken an interesting position in this appeal. When plaintiffs requested an exemption for the Professional Center, the board granted a 50% exemption. This percentage was determined by comparing the amount of floor space used to generate rental income with the amount of floor space used by the hospital itself. The board now takes the position that a proportionate exemption is inappropriate, even if portions of the prop-

erty otherwise meet the requirements for exemption, relying on *Illinois Institute of Technology v. Skinner* (1971), 49 Ill. 2d 59, 273 N.E.2d 371.

The board, however, has misinterpreted the holding of *Skinner*. The *Skinner* court noted that while the primary use of property determines tax-exemption status, there are two distinct situations to which this principle applies. One is where the property as a whole is used for both exempting and nonexempting purposes. In that case, an exemption is appropriate only if the exempting use is primary and the nonexempting use is incidental. (49 Ill. 2d 59, 66, 273 N.E.2d 371.) The second situation is where distinct portions of the property are used for exempting purposes while the remainder is used for nonexempting purposes. In such a case, the *remainder alone* would be taxable if it is a substantial portion of the property. (49 Ill. 2d 59, 66, 273 N.E.2d 372.) The *Skinner* court concluded:

> "Thus, 'there may be separate assessments by separating uses, as in the case of *First M.E. Church v. City of Chicago*, 26 Ill. 482, where the court held that the first story of the church building, occupied for stores, banking business and the like, and the second story, used for lawyers' and doctors' offices and other business purposes, were not exempt from taxation, but the main body of the third and fourth stories, used for religious purposes, was exempt.'" *Illinois Institute of Technology v. Skinner* (1971), 49 Ill. 2d 59, 66, 273 N.E.2d 371, quoting *People ex rel. Carr. v. Sanitary District of Chicago* (1923), 307 Ill. 24, 27-28, 138 N.E. 209.

In this case, plaintiffs claim on appeal that only certain portions of the Professional Center, those used primarily for charitable purposes, are entitled to exemption. If plaintiffs were claiming that the entire Professional Center is exempt, then an analysis under the first example set forth in *Skinner* would be appropriate. Because plaintiffs only claim portions of the property are exempt, however, there is no requirement that the entire property be used primarily for charitable purposes. Plaintiffs are entitled to a proportionate exemption for any distinct portions of the property which meet the test for exemption. See *Metropolitan Sanitary District v. Rosewell* (1985), 133 Ill. App. 3d 153, 156, 478 N.E.2d 1100; *Hopedale Medical Foundation v. Tazewell County Collector* (1978), 59 Ill. App. 3d 816, 823, 375 N.E.2d 1376.

Having decided the appropriate standard of review and that a proportionate exemption is not prohibited, the inquiry now must focus on whether the property in question is used exclusively for chari-

table purposes. Article IX, section 6, of the 1970 Illinois Constitution allows the legislature to exempt from taxation property used exclusively for charitable purposes. (Ill. Const. 1970, art. IX, sec. 6.) Section 19.7 of the Revenue Act of 1939 allows exemptions for "[a]ll property of institutions of public charity, all property of beneficent and charitable organizations *** when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit." Ill. Rev. Stat. 1981, ch. 120, par. 500.7.

 The criteria for determining whether an organization qualifies for this exemption is set out in *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537. (*Board of Certified Safety Professionals of the Americas, Inc. v. Johnson* (1986), 112 Ill. 2d 542, 546, 494 N.E.2d 485.) Our supreme court established the following principles which constituted the frame of reference to determine whether or not a use was in fact exclusively for charitable purposes: (1) the use was for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare—or in some way reducing the burdens of government; (2) that the charitable institution has no capital, capital stock or shareholders, earns no profits or dividends, but rather derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter; (3) that the institution dispenses charity to all who need and apply for it, does not provide gain or profit in a private sense to any person connected with it, and does not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses; (4) that the statements of the agents of an institution and the wording of its governing legal documents evidencing an intention to use its property exclusively for charitable purposes do not relieve such institution of the burden of proving that its property actually and factually is so used; (5) and that the term "exclusively used" means the primary purpose for which property is used and not any secondary or incidental purpose. (*Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 157, 233 N.E.2d 537.) The burden of proving the right to exemption is upon the party seeking it, and, in determining whether property is included within the scope of an exemption, all facts are to be construed and all debatable questions resolved in favor of taxation. (*Board of Certified Safety Professionals of the Americas, Inc. v. Johnson* (1986), 112 Ill. 2d 542, 547, 494 N.E.2d 485.) As the concept of property use which is exclusively charitable does not lend it-

self to easy definition, each individual claim for tax exemption must be determined from the facts presented. (*Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 156, 233 N.E.2d 537.) Although the courts do not have the power to create an exemption by judicial interpretation (*People ex rel. Baldwin v. Jessamine Withers Home* (1924), 312 Ill. 136, 139, 143 N.E. 414; *Evangelical Hospital Association v. Novak* (1984), 125 Ill. App. 3d 439, 442, 465 N.E.2d 986), the determination of whether the property use is exclusively charitable is a judicial function. *Small v. Pangle* (1975), 60 Ill. 2d 510, 516, 328 N.E.2d 285.

 After carefully considering the record and the foregoing legal principles, we conclude, as did the Department of Revenue, that the Immediate Care Center does not qualify for a charitable exemption because it is not exclusively used for charitable purposes. All patients who utilize the Immediate Care Center are billed. None of the advertisements for the center disclose any charitable nature of the facility, and, in fact, the advertisements notify the public of the inexpensive cost of the services and of the alternative methods of payment by insurance, Visa, or Master Card. Free or charitable care is not mentioned. In 1982, only 6% of the total revenue of the Immediate Care Center was found to be uncollectible. Plaintiffs call this 6% free care, although there is no evidence in the record that the recipients of this "free care" were ever aware that they were receiving charity other than that the debts were not being collected. There is no evidence that the general public knows that free care is available at the center. It also appears that efforts are first made to collect unpaid bills, even from those later determined to be unable financially to pay them, thereby requesting and perhaps receiving some payment from those very persons whom the plaintiffs claim they serve as charity cases. These uncollectible amounts, in reality, are nothing more than bad debts. On these facts, we conclude that the small amount of uncollectible bills of some 6% of the revenue of the center, which are only classified as free care when ultimately determined to be uncollectible, does not entitle plaintiffs to a charitable exemption for the Immediate Care Center as property exclusively or primarily used for charitable purposes.

Plaintiffs contend, however, that in *Sisters of Third Order of St. Francis v. Board of Review* (1907), 231 Ill. 317, 83 N.E. 272, where only 5% of the total patients were charity patients, the court found the hospital to be a public charity actually and exclusively used for charitable purposes. We are not persuaded that the factual considerations in that case are similar to those presented here. It is apparent

that the hospital in *Sisters of St. Francis* was clearly deemed to be an institution of public charity and the fact that the vast majority of patients paid for care was not a valid basis to remove that classification "so long as charity was dispensed to all those who needed it and who applied therefor, *** and so long as it does not appear that any obstacle, of any character, was *** placed in the way of those who might need charity of the kind dispensed by this institution, calculated to prevent such persons making application to or obtaining admission to the hospital." 231 Ill. 317, 322, 83 N.E. 272.

In the case at bar, the Immediate Care Center does not dispense charity to all those who need it or apply for it. The fact is that the general public and those who ultimately do not pay for medical services are never made aware that free care may be available to those who need it. The only evidence is that the bills which the hospital ultimately determines are uncollectible are not pursued to collection. The facts here are not comparable to those in *Sisters of St. Francis*.

Nor do we believe that *People ex rel. Cannon v. Southern Illinois Hospital Corp.* (1949), 404 Ill. 66, 88 N.E.2d 20, supports plaintiffs' position. Similar to *Sisters of St. Francis*, the court in *Southern Illinois Hospital* ruled that no obstacle was placed by the hospital that would hinder or prevent needy persons from seeking or receiving the charity the hospital dispenses. All emergency cases were immediately treated without question of ability to pay, and all elective cases were ultimately treated despite an inability to pay even though a waiting period was caused by the hospital's investigation to see if the patient is available for relief. (404 Ill. 66, 73, 88 N.E.2d 20.) The court, however, was not confronted with a set of facts similar to these in the case at bar where there is no showing that the general public or the eventual patients were made aware that they could receive free care and that case is also not controlling. Both *Sisters of St. Francis* and *Southern Illinois Hospital* involved institutions set up primarily for a charitable purpose, while the operations and collection procedures of the Immediate Care Center demonstrate, at best, a charitable result as a secondary or incidental purpose.

The next question is whether plaintiffs have met their burden of proving that the laboratory is primarily used for charitable purposes. The evidence regarding the use of the laboratory is minimal. A witness for the hospital characterized the laboratory as a "satellite" of the hospital laboratory. The witness testified that the laboratory provides some of the basic testing for patients of the Immediate Care Center and for patients of the physicians in the building as well as

some of the testing for patients at the hospital. When asked if the laboratory, the radiology unit, or the Immediate Care Center produced income for plaintiffs, the witness responded that the radiology unit, a rental unit, produces income, but did not state whether the laboratory was rented or not.

■ The evidence set forth above is insufficient to carry plaintiffs' burden of proving that the laboratory is primarily used for charitable purposes. Plaintiffs have not shown any figures regarding the percentage of laboratory work done for the various users. It could be that most of the work is done for the hospital, but it is even more likely that most of the testing is performed for the physicians in the building. If most of the testing is done for the building's physicians, the primary use would be to generate profit. Also, plaintiffs have not proved that any free care is dispensed by the laboratory. Without more evidence as to the actual use of the laboratory, it is impossible to determine whether the primary use is charitable. Plaintiffs have not met their burden of proof and, thus, are not entitled to an exemption for the laboratory.

We consider next whether plaintiffs have met their burden of proving that the exercise and community rooms are primarily used for charitable purposes. The exercise room has a dual purpose. It is available to patients of the building's physicians at no cost. The room is also used by the hospital to conduct exercise programs, weight control programs, and aerobics classes. These programs are open to the public and are free, except for a small fee to pay for an outside aerobics instructor. No income is generated for the hospital. One of the brochures advertising the Professional Center states that use of the exercise center is free to patients of the center's physicians.

Plaintiffs state that the community room, which can accommodate 40 to 50 people, is available to residents of the community for various programs and meetings at no charge and for ongoing patient education programs. The physicians conduct a lecture series, and the community is invited to attend. An exhibit lists numerous medical-related programs in the community room over a four-month period put on by nurses or physicians. These include programs on first aid, blood pressure detection, back care, acne treatment, eye surgery, foot problems, parenting, and pregnancy.

The hearing officer determined that neither room qualified as charitable exemptions because neither room fulfilled a major criterion for charitable use: that a burden of government is relieved by the use of these rooms.

The law recognizes as charitable those purposes which will benefit an indefinite number of persons either by the influence of education or religion or by relieving their bodies from disease, suffering and constraint or by erecting or maintaining public buildings or works or by otherwise lessening the burden upon the State to care for and advance the interests of its citizens. (*American College of Surgeons v. Korzen* (1967), 36 Ill. 2d 340, 347, 224 N.E.2d 7.) The plaintiffs must also bear the burden of proving the right to the exemption by demonstrating that the primary purpose for which the property is used is for a charitable purpose. See *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 157, 233 N.E.2d 537.

It is readily apparent that plaintiffs have failed to meet their burden that the exercise room is primarily used for charitable purpose. No data was given concerning the public's use of the exercise room except general testimony that exercise, weight control, and aerobics classes are held there. On the other hand, the evidence shows that the exercise room is on the second floor of the center where private physicians and dentist offices are located. A brochure advertising the center states that the exercise room is free to patients of the Professional Center's physicians. Thus, both easy access to and awareness of the exercise room for the general public is not obtained. In addition, both the exercise room and the community room, based on the limited evidence in this record of their use, do not lessen the burden of the State to care for and advance the interests of its citizens. Although plaintiffs claim that certain activities occur in the exercise room and the community room which in some ways may be perceived as relieving the burden of the State to advance the interest of its citizens, we conclude that the rooms are situated in a building primarily used by private physicians and dentists and appear to be more incidental to promoting these professionals' private business than to lessen the burden of the State to care for and advance the interest of its citizens.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

NASH, J., concurs.

JUSTICE DUNN, dissenting:
I respectfully dissent. I would find that plaintiff is entitled to a partial exemption for the Immediate Care Center and the community

and exercise rooms.

The majority concludes that the Immediate Care Center is not exclusively used for charitable purposes and is therefore not entitled to an exemption. This conclusion is reached because all patients are billed for the treatments they receive, the advertisements for the Center do not state that free care is available, and only 6% of the care provided in 1982 was free care. Those facts, however, do not alter the charitable character of the Immediate Care Center.

The fact that only 6% of the Immediate Care Center's total billing for 1982 was provided as free care is not a sufficient basis on which to deny the requested exemption. The argument that a provider of health care services should not be held to be an institution of public charity where those who pay for their care greatly outnumber charity patients was rejected by our supreme court in *Sisters of Third Order of St. Francis v. Board of Review* (1907), 231 Ill. 317, 83 N.E. 272. The court there characterized such argument as "without merit, so long as charity was dispensed to all those who needed it *and* who applied therefor, and so long as no private gain or profit came to any person connected with the institution, and so long as it does not appear that any obstacle, of any character, was by the corporation placed in the way of those who might need charity of the kind dispensed by this institution, calculated to prevent such persons making application to or obtaining admission to the hospital." (Emphasis added.) 231 Ill. 317, 322, 83 N.E. 272.

Although recognizing that it is not the percentage of free care which determines the right to exemption, the majority holds that the Immediate Care Center is not charitable because it does not advertise the availability of free care and because payment is expected, at least initially, from all patients. The majority holding has thus inserted a new requirement for charitable exemption: the availability of free care must be advertised to the public. Having examined the cases which set forth the requirements for a charitable exemption, however, I note no such requirement, and I would decline to now impose that unprecedented burden on this not-for-profit medical provider.

Nor does the Immediate Care Center's billing procedure impose an impermissible obstacle between the provision of care and those needing treatment. While all patients are billed for their treatment, all patients are treated *before* receiving a bill. There is no differentiation made in treatment afforded between those who eventually pay and those who cannot. It seems that because of the outpatient type of medical care dispensed at the Immediate Care Center, financial

screening is not available prior to treatment. Instead, a decision regarding ability to pay is made after treatment is rendered and a bill sent. If a patient can then show inability to pay, collection proceedings stop. While financial screening prior to treatment may be feasible in an inpatient setting, the methods employed by the Immediate Care Center are a reasonable attempt to collect payment from those who are able to pay.

In *People ex rel. Cannon v. Southern Illinois Hospital Corp.* (1949), 404 Ill. 66, 88 N.E. 20, it was also argued that the hospital was not entitled to an exemption due to its manner of admitting patients who were unable to pay for hospital services. When an elective patient presented himself for treatment, the hospital required a week's board in advance. If a patient could not make such payment, he was asked to wait until an investigation was made to see if he was eligible for relief and arrangements were made with the proper relief agency for payment. (404 Ill. 66, 72, 88 N.E. 20.) Although the trial judge found the waiting period to be a disqualifying obstacle, the supreme court did not agree, noting, "Sound business dictates that hospitals inquire into the ability of a prospective patient to pay, and it is the generally accepted practice of all hospitals." (404 Ill. 66, 73, 88 N.E. 20.) In contrast, the Immediate Care Center requires no waiting period or prepayment for services. While the Southern Illinois Hospital investigated elective patients' abilities to pay before treatment, the Immediate Care Center renders treatment first and then determines through their billing procedures whether patients are able to pay. By providing care before financial screening, the Immediate Care Center imposes less of an obstacle than the waiting period of Southern Illinois Hospital.

The majority would distinguish *Sisters of St. Francis* and *Southern Illinois Hospital* from the instant plaintiff on the basis that the former were set up primarily for charitable purposes. It seems to me, however, that plaintiff, too, was organized primarily for a charitable purpose and, in that respect, is no different than the aforementioned medical facilities.

Previous decisions have set forth the distinctive characteristics of a charitable institution. A charitable institution "has no capital, capital stock or shareholders, earns no profits or dividends, but rather derives its funds from public and private charity and *holds them in trust for the objects and purposes expressed in its charter*." (*Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 157, 233 N.E.2d 537.) As noted above, a charitable institution dispenses charity to all who need and apply for it, does not provide gain or profit

in a private sense to any person connected with it, and does not place obstacles of any character in the way of those who need and would avail themselves of the benefits it dispenses. (*Sisters of Third Order of St. Francis v. Board of Review* (1907), 231 Ill. 317, 322, 83 N.E. 272.) Furthermore, hospitals have been held to be charitable organizations "provided all funds received by the hospital are devoted to its charitable purpose and no part of the money received by it is permitted to inure to the benefit of any private individual engaged in managing the charity." *People ex rel. Cannon v. Southern Illinois Hospital Corp.* (1949), 404 Ill. 66, 69-70, 88 N.E.2d 20.

Highland Park Hospital acquired title to the property in question on December 21, 1979. The hospital is organized as a not-for-profit corporation. The hospital's articles of incorporation provide that the purposes of the corporation are to establish medical facilities and to carry on its activities exclusively for charitable, scientific, and educational purposes in a manner that no earnings inure to any trustee, officer, or individual.

In 1982, the directors of the hospital formed five corporations to provide flexibility and protection of assets for the total organization. The parent corporation is Lakeland Health Services Corporation, which establishes policy and oversees the operations of the subsidiaries. The board of that corporation is identical to the board of the hospital. The hospital continues to function as it has in the past, providing health services at the hospital location. The Highland Park Hospital Foundation was formed to raise funds for the health care services. Groveland Properties, Inc., is a real estate holding company whose purpose is to manage any property acquisitions. The property in question is presently the only property owned by Groveland. Any funds received by Groveland in managing the property in excess of operating costs are turned over to the Highland Park Hospital Foundation. The hospital also obtains funds from patient revenues, from contributions from the community, and from the Federal government. All of the corporations are not-for-profit and enjoy tax-exempt status from the United States Treasury Department.

It is apparent that the financial structure, policy of remuneration of officers and directors, application of fees collected, and the method and purpose of operation typify plaintiffs as charitable institutions under the principles set forth above. It is of no consequence that title to the property in question is held by Groveland rather than the hospital itself. This mode of holding title is merely an attempt to more efficiently implement the overall corporate purpose. "If ways of doing things have become outmoded or replaced by more

efficient and realistic methods of management, the law will look to the substance, not to mere forms." *Association of American Medical Colleges v. Lorenz* (1959), 17 Ill. 2d 125, 129, 160 N.E.2d 763.

I would also hold that plaintiffs are entitled to an exemption for the community and exercise rooms. The community room, which can accommodate 40 to 50 people, is open to residents of the community and recognized community groups for programs and meetings, at no charge. The hospital also conducts a series of health eduction programs, including classes in cardiopulmonary resuscitation and first aid, at no cost except for some small materials charges. Physicians conduct a lecture series in the room covering various health-related topics. The lectures are free ánd open to the public.

The exercise room has a dual purpose. It is available to patients of the building's physicians at no cost. The room is also used by the Hospital to conduct exercise programs, weight control programs, and aerobic classes. These programs are open to the public and are free, with the exception of a small fee to pay for an outside aerobics instructor. Neither the community room nor the exercise room produces any income for the hospital.

The Department of Revenue and the majority determined that neither room qualified for a charitable exemption. While recognizing that the public may benefit from the lectures and classes, both the Department and the majority found that the use of the rooms did not fulfill a major criterium for charitable use, *i.e.*, that a burden of government is relieved.

It is true that relief of a government burden is an essential element of a charitable use. "The reason for exemptions in favor of charitable institutions is the benefit conferred upon the public by them, and a consequent relief, *to some extent*, of the burden upon the State to care for and advance the interests of its citizens." (Emphasis added.) (*People v. YMCA* (1937), 365 Ill. 118, 122, 6 N.E.2d 166.) Thus, plaintiffs must show some relief of a government burden to qualify for exemption.

The hearing officer noted that provision of health care lectures, aerobics, and exercise programs is not an obligation of government. It seems here, however, that the Department employed too narrow a focus in determining whether a government burden has been relieved by the use of the community and exercise rooms. This requirement is not so stringent as to exclude programs whose goal is to *avert* a need for government assistance. In holding that the YMCA of Chicago was entitled to a charitable exemption, the Illinois Supreme Court quoted with approval *Commonwealth v. YMCA* (1903),

116 Ky. 711, 76 S.W. 522, where it was stated of the charitable nature of the association's work:

"It is not so much the giving of alms or in aid of the mendicant; the endeavor is to reach the boys and young men *before* they need alms and *before* they are reduced to beggary, and by training their minds and *teaching them how to use and preserve their bodies* \*\*\*." (Emphasis added.) *People v. YMCA* (1937), 365 Ill. 118, 123, 6 N.E.2d 166.

Here, too, plaintiffs' use of the community room and exercise room is designed to prevent burdens on government. By teaching the public how to be more healthy, and by providing the public with the equipment with which to implement that knowledge, plaintiffs are using their property in a way which lessens to some extent the burden of government to advance the interest of its citizens. (See, *e.g., American College of Surgeons v. Korzen* (1967), 36 Ill. 2d 340, 348-49, 224 N.E.2d 7.) As the saying goes, an ounce of prevention is worth a pound of cure.

Although the majority holds that plaintiffs have not shown the primary use of the exercise room is charitable because no data concerning public use was offered, I would find that plaintiffs have met their burden of proof. There was adequate testimony that the room was extensively used by residents of Long Grove, as well as by residents of neighboring communities. In denying the exemption, the majority notes that the exercise room is on the second floor of the building so that easy access to the general public is not obtained. That argument is "make weight." I fail to see how one flight of stairs or the need to ride an elevator one floor constitutes a barrier to easy public access.

In conclusion, I would find that plaintiffs are entitled to a partial exemption for the Immediate Care Center and the community and exercise rooms.

For the foregoing reasons, I respectfully dissent.