Nos. 3--02--0590, 3--02--0602 cons.

_________________________________________________________________

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2003

 ) 

RIVERSIDE MEDICAL CENTER, an ) Appeal from the Circuit Court

Illinois not-for-profit ) for the 21th Judicial Circuit,

corporation, ) Kankakee County, Illinois

) 

Plaintiff-Appellee, ) 

) No. 01--MR–950

)

) 

 ) Honorable Fred S. Carr, Jr.,

THE DEPARTMENT OF REVENUE OF ) Judge, Presiding 

THE STATE OF ILLINOIS and THE )

KANKAKEE COUNTY BOARD OF )

REVIEW, )

) 

     Defendants-Appellants. )

_________________________________________________________________

PRESIDING JUSTICE McDADE delivered the opinion of the court
:

_________________________________________________________________

In this appeal, the defendants, the Illinois Department of Revenue and the Kankakee County Board of Review, seek review of the decision of the Kankakee County circuit court granting the plaintiff, Riverside Medical Center, a charitable exemption from property taxes under section 15--65 of the Property Tax Code (35 ILCS 200/15–65 (West 2000) for clinics it owns in Bourbonnais, Maneto and Momence. The defendants argue that the subject properties do not meet the requirements for an exemption. For the following reasons, we reverse the order of the circuit court of Kankakee County and confirm the decision of the Illinois Department of Revenue.  

FACTS 

The plaintiff, Riverside Medical Center, is a not-for-profit corporation that owns a hospital and eight clinics in and around Kankakee. Three clinics are located in Bourbonnais, Momence and Maneto. Riverside applied to the Illinois Department of Revenue (the Department) for property tax exemptions for these clinics for 1998 on the basis that the properties were used for charitable purposes. The Department granted the exemptions, except for portions that were rented out to private physicians. Following the Department's determination, the Kankakee County Board of Review requested a formal hearing. 

The matter proceeded to an administrative hearing before administrative law judge Alan Marcus. The parties stipulated that the only parts of the clinics that were potentially eligible for an exemption were those portions that had not been rented to private doctors. David Schroeder, the chief financial officer and treasurer of Riverside Health System, was the only witness.

Schroeder testified to the corporate and financial structure of the Riverside system. Riverside Health Systems is a not-for-profit corporation that is exempt from federal income tax pursuant to section 501(c)(3) of the Internal Revenue Code of 1954 (the Code) (26 U.S.C. §501(c)(3) (2000)). The corporation is also designated as a public charity under Section 509(a)(1) of the Code (26 U.S.C. §509(a)(1) (2000)). 

The corporation's articles of incorporation dedicate it to the improvement of the health of the communities it serves through the provision of charitable health care. The charter devotes Riverside's operations and revenue to that purpose. The system covers its operating costs through patient fees, grants, and donations. The three clinics obtained almost 100% of their revenue from patient fees, with rent also a minor contributing income source. Donations amounted to 0.05% of Riverside's 1998 revenue. Riverside budgets 3% of its total budget for charity care; however, there was no evidence presented to indicate that Riverside limits charity care to only 3% of its budget. Riverside is a party to agreements with Medicare, Medicaid and other large health insurers to provide health care at discounted prices to members of those plans. In 1998, Riverside provided $191,670,616 worth of patient services. After discounts due to Riverside's agreements with the insurers, it received only $92,558,756, or approximately 50% of the value of the medical services rendered. The three clinics at issue ran a combined deficit of $850,000 in 1998.  The Riverside system as a whole, however, had a net revenue of approximately $10 million in 1998.  

Schroeder testified that the clinics fulfill their charitable purpose by giving charity care to patients who are unable to pay. The clinics do this in two ways. First, a physician working at the clinic may choose to give informal care to a patient with whose financial situation he or she is familiar. In those cases, the physician will treat the patient, but will not bill for the services. Rather, the care will be given free from the outset. 

Second, the clinic gives out "charity care" to those individuals that it later determines are unable to pay. The clinic gives care to all patients who come to the clinic and does not demand proof of ability to pay before treatment is administered. Later, the clinic bills the patient. Upon nonpayment, another bill is sent out 30 days later. The clinic repeats this process several times. If, after several invoices are sent to the patient, the bill remains unpaid, the clinic turns the account over to its collections department. The department contacts the patient by phone to determine why the bill has not been paid. If the patient, at that time, indicates that he or she is unable to pay, the collections agent gives the patient an opportunity to submit a charity care application. If the patient indicates on the application an inability to pay, the bill is written off as uncollectible and further efforts at collection are discontinued. The clinics do not advertise the availability of charity care. 

Following the hearing, Judge Marcus issued a recommendation that the subject properties not be given a tax exemption. The judge noted that 97% of the clinics' revenues came from patient billing, and that Riverside could not produce documentation to prove the amount of charity care actually given in 1998. The judge believed that this, in conjunction with the fact that the clinics billed all patients and did not advertise the availability of charity care, led to the conclusion that the clinics were not primarily used for charitable purposes. The judge characterized the 3% budget for charity care as 
de minimus
 and found that the clinics were primarily used for providing medical care to patients who were able to pay. The Director of the Department of Revenue, acting in accordance with the judge's recommendation, issued an order denying an exemption on November 6, 2001.

Riverside filed a complaint for administrative review on December 7, 2001. The court, after hearing argument in the matter, found that the ruling of the Department was clearly erroneous. The court found the clinic deficit of $850,000 was not 
de minimus
 and issued tax exemptions for the properties. The Kankakee Board of Review (the Board) and the Illinois Department of Revenue now appeal that decision.

ANALYSIS

Riverside claims an exemption from Illinois property taxes under section 15-65 of the Property Tax Code (35 ILCS 200/15--65 (West 2000). The provision states that all institutions of public charity are exempt from property tax when "actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit." 35 ILCS 200/15--65 (West 2000). While the parties do not dispute that the clinics are institutions of public charity, they do dispute whether the clinics are used exclusively for charitable purposes. The Board and the Department argue that the amount of charity care actually given by the clinics is insufficient, when compared to care given by the clinics that is paid for by patients. The State characterizes the clinics' practice of ceasing collection efforts in cases where the patient is unable to pay as the writing off of bad debts rather than the providing of charity care.

In reviewing an administrative decision under the Administrative Review Law (735 ILCS 5/3-101 et seq. (West 2000)), the appellate court reviews the administrative agency's decision, rather than that of the trial court. 
Peoria & Pekin Union Ry. Co. v. Department of Revenue
, 301 Ill. App. 3d 736, 739-40, 704 N.E.2d 884, 887 (1998). The decision of the administrative agency should not be overturned unless it is clearly erroneous. 
Lutheran Church of the Good Sheperd of Bourbonnais v. Department of Revenue
, 316 Ill. App. 3d 828, 831, 737 N.E.2d 1075, 1078 (2000). In other words, the determination should not be overturned unless the record leaves the reviewing court with the "’definite and firm conviction that a mistake has been committed.’" 
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001), quoting 
United States v. United States Gypsum Co.,
 333 U.S. 364, 395, 92 L.Ed. 746, 766, 68 S.Ct. 525, 542 (1948).

To determine whether the clinics are eligible for a property tax exemption under section 15-65, we use the test established in 
Methodist Old Peoples Home v. Korzen
, 39 Ill. 2d 149, 233 N.E.2d 537 (1968). In order to be eligible, the alleged charity must show that: (1) it is set up for the benefit of an indeterminate number of persons; (2) it has no capital, capital stock or shareholders and earns no profits or dividends; (3) it derives its funds primarily from public and private charity and holds those funds in trust for the objectives and purposes expressed in its charter; (4) it dispenses charity to all who need and apply for it, does not provide gain or profit in a private sense to any person connected with it, and does not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses; (5) the property is actually and factually used exclusively for the charitable purpose, regardless of any intent expressed in the organization's charter or bylaws; and (6) charity use is the primary purpose for which the property is used and not a secondary or incidental purpose.
 Old Peoples Home
, 39 Ill. 2d at 156-57, 233 N.E.2d at 541-42.

With regard to the first factor, the record clearly indicates that the clinics are set up for the benefit of an indefinite number of individuals. The clinics do not place a numerical limit on the number of people who can receive charity care. Although the clinic only sets aside 3% of its budget for charity care, there is no indication that charity care is limited by that amount. The clinics' witness testified, and the State does not dispute, that the clinics will offer charity care to anyone who is unable to pay for services rendered. 

Second, the Riverside system does not have shareholders or capital like a traditional corporation. Profits are not distributed to owners, and all assets are used to further the system's charitable mission. The three clinics, as constituents of the Riverside system, share these attributes.  We note, however, that Riverside had a net revenue of $10 million in 1998.  While we do not believe this fact necessarily requires a finding in favor of taxation, in general this level of revenue is not consistent with the provision of charity.
  

We find on the third factor that, as the State points out, Riverside and the clinics do not derive the majority of their funds from private or public charity. Ninety-seven percent of Riverside's revenues for 1998 came from patient billings. The clinics also had income from rental space. Only 0.05% came from donations. No grants or donations were made directly to the three clinics at issue, and it is unclear whether donations made to Riverside were in any way used for the benefit of the clinics. This factor clearly does not favor Riverside's position. 

Riverside also falls short on the fourth factor.  As the State points out, the clinics do not dispense charity to all who need it and they place obstacles in the way of those who seek charity. The clinics do this in several ways. First, they do not advertise the fact that they provide charity care to those who cannot afford to pay for medical services. The State contends that this fact prevents many who may be in need of charity services from receiving charity treatment, since they do not know that such care is available. Second, the State asserts that the clinics place obstacles in the way of those eligible for charity care by sending bills to all patients and not stating on the bill at any time that charity care may be available. Therefore, those who would otherwise need charity care may pay their bill anyway, despite their eligibility for free care. 

Riverside responds by arguing that it provides care to all who come to the clinics without regard to their ability to pay. The record indicates that (1) Riverside does not perform any pre-care screening to determine whether a patient can afford to pay his or her bill; (2) the clinics give the same care to all patients, regardless of the ability to pay; and (3) the clinics do not turn patients away. Furthermore, the clinics do not pursue collection efforts once it has been determined that the patient cannot pay the medical bill.

The cases of 
Highland Park Hospital v. Department of Revenue
, 155 Ill. App. 3d 272, 507 N.E.2d 1331 (1987), and 
Alivio Medical Center v. Illinois Department of Revenue
, 299 Ill. App. 3d 647, 702 N.E.2d 189 (1998), deal squarely with the issue. In 
Highland Park
, the hospital gave free care in a manner similar to that used by Riverside. All patients were seen by a doctor without any preliminary screening concerning the ability to pay. The patient was then billed after the visit. After 90 days, if the patient was unable to pay the bill, the debt was classified as uncollectible and written off as free care. The clinic in 
Highland Park
 wrote off approximately 6% of its care in this way. 
Highland Park
, 155 Ill. App. 3d at 276, 507 N.E.2d at 1334.

Similarly, in 
Alivio
, the clinic wrote off around 25% of its billings as charity care. 
Alivio
, 299 Ill. App. 3d at 649, 702 N.E.2d at 191. The clinic would charge each patient the full price of services following the visit but reduced the amount based on the patient's ability to pay if the full amount had not been paid after several statements were sent. 
Alivio
, 299 Ill. App. 3d at 649, 702 N.E.2d at 191.

In both cases, the court found that the clinics were not giving charity care but, rather, were writing off "bad debts." 
Alivio
, 299 Ill. App. 3d at 652, 702 N.E.2d at 193; 
Highland Park
, 155 Ill. App. 3d at 280-81, 507 N.E.2d at 1336. In both cases, too, the court found relevant the fact that the clinics did not advertise the availability of charity care. 
Alivio
, 299 Ill. App. 3d at 652, 702 N.E.2d at 193. 
Highland Park
, 155 Ill. App. 3d at 281, 507 N.E.2d at 1337. The decisions in 
Highland Park
 and 
Alivio
 are persuasive and we agree with and adopt the reasoning.  

Next to be determined is whether the clinics were actually used exclusively for charitable purposes. To determine the use of the clinics, it is appropriate to consider the bylaws and charter of the allegedly charitable organization.
 Chicago Patrolmen's Ass'n v. Department of Revenue
, 171 Ill. 2d 263, 271, 664 N.E.2d 52, 57 (1996). However, even if the organization's charter devotes it to charitable service, the court should examine whether the organization is acting pursuant to the charter and is actually performing charitable works. 
Morton Temple Ass'n, Inc. v. Department of Revenue
, 158 Ill. App. 3d 794, 796, 511 N.E.2d 892, 893 (1987).   

The Riverside charter devotes the clinics to the provision of charitable health care in the areas that it serves. However, the clinics must actually provide exclusively charitable care to the community. This the clinics do not do. Although the Riverside system provides 3% of its budget for charity care, and even though the three clinics at issue ran an $850,000 deficit for 1998, the evidence indicates that the primary use of the clinics is to provide care to patients who are able to pay, either individually or through Medicare, Medicaid or private insurance. Furthermore, the failure of Riverside to advertise the availability of charity care assures that such care will remain a small percentage of the total care provided by the clinics.

Riverside argues, however, that its charity care is not limited to the provision of free care. It points out that it also provides discounted care to patients through Medicare, Medicaid and private insurance. Specifically, Riverside claims to give this care at 50% of actual cost. We are unpersuaded by the argument. Although Riverside does give discounts, these discounts are given pursuant to contract. The large insurers have negotiated preferential rates with Riverside, but there is no indication that Riverside agreed to the arrangement in pursuit of its charitable mission. It may be that Riverside agreed to the rate discounts as a way of attracting a reliable stream of business from patients insured by the large insurers. At any rate, we are confident that these discounts are not charitable and do not warrant a finding in favor of Riverside.

Sixth and finally, it must be determined whether charity is the primary use of the subject property or rather whether it is a secondary or incidental use. For the reasons discussed in the previous paragraph, charity appears to be, at best, a secondary use of the properties in question. It is difficult to determine exactly how much charity care was given at the clinics themselves since such information was not submitted to the record, but it appears that it does not amount to the majority of the care given by the clinic. Charity care given by the clinics may be as little as the 3% budgeted for that purpose by the Riverside system generally. 

The evidence in the record indicates that the three clinics in the Riverside system are not used primarily for charitable purposes. In fact, the clinics at issue here share significant characteristics with the institutions in 
Alivio
 and 
Highland Park
, in that they do not advertise the availability of charity care and only extend such care when patients do not pay after repeated billings. In 
Alivio
 and 
Highland
, the appellate court denied the requested exemption. The same result obtains here. The ruling of the Department of Revenue was not clearly erroneous and it is confirmed.

CONCLUSION

The record and applicable case law support the conclusion that the Riverside clinics are not eligible for a charitable exemption from state property taxes. The clinics are not used primarily for charitable purposes. Rather, charity care appears to be a use secondary to the primary function of providing health care to paying customers. Also, the cases of 
Alivio
 and 
Highland Park
, which present billing schemes similar to the one used by the Riverside clinics, support the conclusion that an exemption should not be granted. The order of the Kankakee County circuit court finding the denial of an exemption by the Illinois Department of Revenue to have been clearly erroneous is reversed and the decision of the Illinois Department of Revenue is confirmed.  

Confirmed.

LYTTON and BARRY, JJ., concur.